LAYNE R. MILLER ET AL. *v.* PETER GUIMARAES ET AL.
(AC 23032)

Dranginis, Bishop and West, Js.

Argued May 5—officially released August 19, 2003

*Jon L. Schoenhorn,* with whom, on the brief, was *Matthew D. Dyer,* for the appellants-cross appellees (defendants).

*Mark S. Rosenblit,* for the appellees-cross appellants (plaintiffs).

BISHOP, J. The defendants, Peter Guimaraes and Guimaraes Construction, Inc., appeal from the judgment of the trial court rendered in favor of the plaintiffs, Layne R. Miller and Paula Miller, in connection with an agreement between the parties for the sale of a lot and the construction of a residential dwelling on it. The defendants claim that the court improperly determined (1) that they breached the contract with the plaintiffs and that Peter Guimaraes is personally liable for the breach, (2) that they violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., by failing to disclose that the building lot on which the house was to be constructed was in the name of a third party, (3) that they breached their implied duty of good faith and fair dealing, (4) that their refusal to return the plaintiffs' deposit constituted the tort of conversion, and (5) that the plaintiffs were entitled to an award of attorney's fees and costs.[1] In their cross appeal, the plaintiffs challenge the determination by the court that the defendants did not perpetrate a fraud by misrepresentation or nondisclosure. The judgment of the trial court is affirmed in part and reversed in part.

The following facts and procedural history are relevant to our discussion of the issues. On or about the second week of February, 1999, the plaintiffs, who are husband and wife, were driving by a subdivision that was being constructed and saw lot 31, an empty lot, located at 121 Boulder Drive in Rocky Hill. On the lot was a sign with the name Guimaraes Construction, Inc. Because the plaintiffs were interested in possibly purchasing the lot, they contacted Peter Guimaraes (con-

[1] The defendants also brought counterclaims of breach of contract, and breach of duty of good faith and fair dealing against the plaintiffs. Our resolution of the issues in favor of the plaintiffs disposes of the issues raised by the defendants regarding their counterclaims. They are without merit.

tractor), the president of Guimaraes Construction, Inc., who met with them on that lot on the same day.

When the plaintiffs expressed interest in purchasing the lot, the contractor told them that he would sell it to them even though he had reserved it for himself. To reserve the lot, the plaintiffs issued a check on February 16, 1999, in the amount of $1000, payable to Guimaraes Construction, Inc., as a deposit. The check was deposited into the bank account of Guimaraes Development, Inc., another company owned by the contractor, because Guimaraes Construction, Inc., did not have a bank account.

On March 6, 1999, the plaintiffs, along with Paula Miller's mother, Evelyn Volpe, met with the contractor to view other houses built by the contractor in the subdivision. During that visit, the contractor told Volpe that he had reserved lot no. 31 for himself, but decided to sell it because business was so good. On April 2, 1999, the plaintiffs entered into a construction contract with Guimaraes Construction, Inc., to purchase lot 31 and for the construction of a house on it.

The total contract price was $338,145, apportioned as $95,000 for the lot and $243,145 for the construction of the dwelling. The contract required the plaintiffs to pay $40,000 at signing with the balance of the contract price to be paid as progress installments during construction as permitted by the buyers' lending institution. The contract also required that the contractor had to obtain all necessary permits on or before April 30, 1999, that the buyers had to obtain a mortgage loan commitment on market terms from a bank or other financial institutional lender on or before May 2, 1999, and that the closing was to take place on or before October 2, 1999.

In accordance with the terms of the construction contract, the plaintiffs had deposited a total of $41,000

by April 2, 1999, the date they signed the construction contract. During the first week of April, 1999, the plaintiffs applied for a mortgage loan with American Savings Bank (bank). When the plaintiffs submitted their financial records to the bank the following week, the bank requested blueprints of the residence in conjunction with the processing of the loan application. When the plaintiffs informed the contractor of the bank's request, he told them that the blueprints were not ready. Instead, he gave them blueprints of a house similar to the one they wanted to have built to facilitate approval of the loan. Upon its receipt of the blueprints, the bank informally approved the loan. Later, by letter dated May 25, 1999, the bank formally approved the plaintiffs' loan.

At about the same time, the plaintiffs requested blueprints of the home, they also asked the contractor to produce the necessary building permits. They made that request because they had become concerned after being told by a Rocky Hill town official that the contractor had not obtained or even applied for the necessary permits, despite numerous assurances to the plaintiffs that he had done so. Unhappy with those circumstances, the plaintiffs asked the contractor for a refund of their deposit. When, however, the contractor refused to return the plaintiffs' deposit and told them that if they brought legal action for its return, their legal expenses would eclipse the amount of the deposit, the plaintiffs decided to go forward with the project.

The plaintiffs placed conditions on their agreement to go forward with the construction. Those conditions were that the contractor would obtain all the necessary building permits and produce the construction blueprints on or before the anticipated closing date of June 7, 1999. Notwithstanding his promises, the contractor failed to provide any evidence of having obtained the building permits by June 7, 1999. At about the time that the plaintiffs confronted the contractor in regard to the

building permits, they learned that there were wetlands on the lot and that for the contractor to receive building permits, he first had to obtain wetlands permits.

Subsequently, the plaintiffs' attorney learned, through a title search, that the contractor did not own lot 31. Rather, the lot was titled in Trinity Ridge Associates Limited Partnership (Trinity Ridge), a party unfamiliar to the plaintiffs. The plaintiffs learned that Trinity Ridge had entered into an agreement dated February 20, 1998, with Guimaraes Development, Inc., an entity with which the plaintiffs had no legal relationship, for the conveyance of lot 31 to the development company with an anticipated closing date of June 20, 1998. That closing did not take place. Additionally, there was no evidence in the agreement between Trinity Ridge and Guimaraes Development, Inc., that either of them had assigned any rights to the property to the contractor.

The parties' relationship further deteriorated over a dispute regarding the amount of funds the contractor demanded that the plaintiffs bring to the closing. Because the contractor did not presently own lot 31, he required adequate funds to purchase the property from Trinity Ridge to be able to convey it to the plaintiffs. As a consequence, he demanded that the plaintiffs bring funds to the closing in an amount greater than the plaintiffs thought necessary. From the plaintiffs' perspective, the $41,000 deposit they already had paid the contractor was to be allocated, in its entirety, to the closing on the lot. To the contrary, the contractor took the position that the deposit paid at the time the parties contracted was to be applied to the construction of the dwelling. Because the bank did not advance to the plaintiffs the entire additional funds the contractor required of them at the closing, compliance with his demands would have required the plaintiffs to produce additional funds from their own resources greater than they believed reasonable or contemplated in their

agreement with the contractor. The parties surmounted that disagreement and determined to proceed, setting a new closing for June 17, 1999, a date by which the contractor had to produce all required building permits and final house blueprints. When by June 17, 1999, the contractor had produced no building permits and had furnished no blueprints, the plaintiffs made demand for a return of their $41,000 deposit.

As a result of the contractor's refusal to return the plaintiffs' deposit, the plaintiffs commenced this action against the defendants, alleging fraudulent misrepresentation (count one), violations of CUTPA (count two), common-law conversion (count three), breach of contract (count four), and breach of the implied duty of good faith and fair dealing (count five). In turn, the defendants filed an answer together with a claim of setoff and a counterclaim, alleging breach of contract (count one) and breach of the duty of good faith and fair dealing (count two). The court found for the plaintiffs on all counts of the complaint except count one, which alleged fraudulent misrepresentation, and rendered judgment in favor of the plaintiffs on the defendants' counterclaims. Last, the court determined that the defendants' claim of setoff for damages stemming from the plaintiffs' alleged breach of contract was not factually supported. This appeal followed. Additional facts will be set forth as necessary.

I

The defendants' first claim is that the court improperly determined that they breached the contract with the plaintiffs and that the contractor was liable personally for that breach. We disagree.

Before addressing the merits of the defendants' claim, we set forth our standard of review. "With regard to the trial court's factual findings, the clearly erroneous standard of review is appropriate. . . . A factual find-

ing is clearly erroneous when it is not supported by any evidence in the record or when there is evidence to support it, but the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . Simply put, we give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses. . . .

"The trial court's legal conclusions are subject to plenary review. [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Citations omitted; internal quotation marks omitted.) *Tuxis-Ohr's, Inc.* v. *Gherlone,* 76 Conn. App. 34, 38–39, 818 A.2d 799, cert. denied, 264 Conn. 907, 826 A.2d 179 (2003).

"In determining whether a failure to render or to offer performance is material, the following circumstances are significant: (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; [and] (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing." (Internal quotation marks omitted.) *669 Atlantic Street Associates* v. *Atlantic-Rockland Stamford Associates,* 43 Conn. App. 113, 126, 682 A.2d 572, cert. denied, 239 Conn. 949, 950, 686 A.2d 126 (1996). The determination of whether a breach is material is a question of fact to be reversed only if found to be clearly

erroneous. See *Bernstein* v. *Nemeyer*, 213 Conn. 665, 670, 570 A.2d 164 (1990).

The court correctly found in its memorandum of decision, filed April 18, 2002, that the defendants had breached their contract with the plaintiffs in two respects. First, the "breach consisted of the defendants placing an additional money requirement on the [plaintiffs], which was not called for under the terms of the construction agreement, that is, the need to bring $38,000 to the closing in order to buy the lot. [Second, the] breach consisted of the failure of the defendants to get the necessary permits by either June 7, 1999, or June 17, 1999, the [plaintiffs] having agreed to extend the date of April 30, 1999, specified in the construction agreement."

Although it is not clear from the language of the contract that the deposit given by the plaintiffs was to be applied toward the purchase price of the lot or the construction of the home, we agree with the court's reasoning that a logical inference from the agreement is that the deposit should have been credited, in its entirety, to the lot purchase. In relevant part, the contract stated that the "balance of $298,145.00 [had] to be paid throughout the construction phases according to buyer[s'] bank disbursements." That "balance" clearly refers to the balance of the entire contract price of $338,145, and contemplates the previous payment of $41,000 by the plaintiffs toward the purchase of the lot. If any of the $41,000 deposit were to be applied toward construction costs, there would have been no reason to contemplate that the balance of funds beyond $41,000 would be paid "according to the buyer[s'] bank disbursements." Thus, it is logical to read the contract as not requiring the plaintiffs to bring any additional money to the closing beyond that already paid and that which the bank was willing to advance for purposes of closing on the lot.

Furthermore, the contractor failed to obtain the necessary permits, despite the plaintiffs' agreement to extend the deadline to June 7 and again to June 17, 1999, for the contractor to obtain the permits. The defendants' argument that the reference in the last modification of the contract to October 2, 1999, as the contemplated closing date does not belie the parties' agreement that the contractor would finally produce the necessary permits and building plans on or before June 17, 1999.

The defendants claim additionally in their reply brief that the court improperly found that they had breached their contract with the plaintiffs because the parol evidence rule "prohibited the trial court from considering testimony of Layne Miller concerning his interpretation of the contract provision[2] requiring 'all necessary permits' by April 30, 1999, concerning the existence of an alleged oral agreement to have final house plans ready by the closing date, and concerning his belief that the entire $40,000 deposit was to be applied to the purchase of the lot before any construction commenced."

"As we have . . . often noted, the parol evidence rule is not a rule of evidence, but a substantive rule of contract law. . . . The rule is premised upon the idea that when the parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed, that the whole engagement of the parties, and the extent and manner of their understanding, was reduced to writing. After this, to permit oral testimony, or prior or contemporaneous conversations, or circumstances, or

---

[2] The relevant provision in the contract on which the defendants rely is article III, which states in relevant part: "Commencement and Completion: Completion means issuance of a permanent unconditioned certificate of occupancy. The contractor agrees to commence work here 10 days after the following: (a) buyer has obtained bank financing and (b) . . . all necessary permits on or before April 30, 1999."

usages . . . in order to learn what was intended, or to contradict what is written, would be dangerous and unjust in the extreme.

"The parol evidence rule does not of itself, therefore, forbid the presentation of parol evidence, that is, evidence outside the four corners of the contract concerning matters governed by an integrated contract, but forbids only the use of such evidence to vary or contradict the terms of such a contract. Parol evidence offered solely to vary or contradict the written terms of an integrated contract is, therefore, legally irrelevant. When offered for that purpose, it is inadmissible not because it is parol evidence, but because it is irrelevant. By implication, such evidence may still be admissible if relevant (1) to explain an ambiguity appearing in the instrument; (2) to prove a collateral oral agreement which does not vary the terms of the writing; (3) to add a missing term in a writing which indicates on its face that it does not set forth the complete agreement; or (4) to show mistake or fraud. . . . These recognized exceptions are, of course, only examples of situations [in which] the evidence (1) does not vary or contradict the contract's terms, or (2) may be considered because the contract has been shown not to be integrated; or (3) tends to show that the contract should be defeated or altered on the equitable ground that relief can be had against any deed or contract in writing founded in mistake or fraud." (Internal quotation marks omitted.) *Schilberg Integrated Metals* v. *Continental Casualty Co.*, 263 Conn. 245, 277–78, 819 A.2d 773 (2003).

Our review of the record leads us to the conclusion that the evidence allowed by the court over the defendants' objections was admitted properly to clarify ambiguous provisions of the contract and not to vary or to contradict its terms. Under those circumstances, we conclude that the court's findings are not clearly erroneous.

Having found that Guimaraes Construction, Inc., breached its contract with the plaintiffs, the court additionally pierced the corporate veil to hold its president personally liable for the breach.

"Our Supreme Court has held that we may disregard the fiction of a separate legal entity to pierce the shield of immunity afforded by the corporate structure in a situation in which the corporate entity has been so controlled and dominated that justice requires liability to be imposed on the real actor. . . . Additionally, the court has affirmed judgments disregarding the corporate entity and imposing individual stockholder liability when a corporation is a mere instrumentality or agent of another corporation or individual owning all or most of its stock. . . .

"When determining whether piercing the corporate veil is proper, our Supreme Court has endorsed two tests: the instrumentality test and the identity test. The instrumentality rule requires, in any case but an express agency, proof of three elements: (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of plaintiff[s'] legal rights; and (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of." (Citations omitted; internal quotation marks omitted.) *Mountview Plaza Associates, Inc.* v. *World Wide Pet Supply, Inc.*, 76 Conn. App. 627, 632–34, 820 A.2d 1105 (2003). The determination of whether the requirements of the instrumentality and identity rules were met is a question of fact to be reversed only if

found to be clearly erroneous. *Davenport* v. *Quinn*, 53 Conn. App. 282, 302, 730 A.2d 1184 (1999).

Here, the court found that the contractor had treated his two companies, Guimaraes Development, Inc., and Guimaraes Construction, Inc., as if they were the same entity. Guimaraes Construction, Inc., did not have a bank account and, as a result, the contractor, as its president, deposited the plaintiffs' $41,000 into the account of Guimaraes Development, Inc. As noted at oral argument, the corporation had no assets in its name. Additionally, the court found that the contractor had exercised complete domination over the policy and business of Guimaraes Construction, Inc. On the basis of our review of the record, we conclude that the factual underpinning found by the court in its determination to pierce the corporate veil was not clearly erroneous.

II

The defendants' second claim is that the court improperly determined that they had breached their implied duty of good faith and fair dealing. We disagree.

As a preliminary matter, we set forth our standard of review. "[W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) *Kenney* v. *Healey Ford-Lincoln-Mercury, Inc.*, 53 Conn. App. 327, 330, 730 A.2d 115 (1999).

"It is axiomatic that the . . . duty of good faith and fair dealing is a covenant implied into a contract or a

contractual relationship. . . . [E]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement . . . . The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term. . . . In accordance with these authorities, the existence of a contract between the parties is a necessary antecedent to any claim of breach of the duty of good faith and fair dealing." (Citations omitted; internal quotation marks omitted.) *Macomber* v. *Travelers Property & Casualty Corp.*, 261 Conn. 620, 638, 804 A.2d 180 (2002).

To recover for breach of the duty of good faith and fair dealing, the plaintiffs had to "*allege and prove* that the defendant[s] engaged in conduct design[ed] to mislead or to deceive . . . or a neglect or refusal to fulfill some duty or some contractual obligation not prompted by an honest mistake as to one's rights or duties . . . ." (Emphasis in original; internal quotation marks omitted.) *Hunte* v. *Amica Mutual Ins. Co.*, 68 Conn. App. 534, 544–45, 792 A.2d 132 (2002).

At the outset, we note that the parties are in agreement that they entered into a valid and enforceable contract. Our review of the record reveals that the court correctly concluded that the plaintiffs had pleaded and proved sufficient facts to support a cause of action for breach of the implied covenant of good faith and fair dealing on the basis of their claims that the defendants had obtained the plaintiffs' deposit without telling them that they did not own lot 31, that they failed to secure the necessary permits in a timely manner, that they did not produce final construction plans by the anticipated closing date, that they required the plaintiffs to bring additional funds to the closing when that was not otherwise required by the language of the parties' contract

and that they failed to inform the plaintiffs that wetlands permits were needed before they could obtain the necessary building permits. Additionally, the court noted that when the plaintiffs asked for the return of their deposit, the contractor told them that it would cost them more in legal fees than any possible recovery they could obtain through litigation. Under those facts, it was not improper for the court to be "satisfied that the defendants engaged in conduct designed to mislead and that this was on the part of the defendants a refusal to fulfill their contractual obligations and that this refusal was not prompted by an honest mistake as to their duties."

### III

The defendants' third claim is that the court improperly determined that they had violated CUTPA by failing to disclose that the building lot on which the home was to be constructed was in the name of a third party. We disagree.

The defendants challenge the legal conclusion of the court that they had a duty to disclose to the plaintiffs that they did not own lot 31. Also, they assert that the court's finding that they violated CUTPA was clearly erroneous.

At the outset, we set forth our standard of review. "[W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) *Kenney* v. *Healey Ford-Lincoln-Mercury, Inc.*, supra, 53 Conn. App. 330.

CUTPA provides in relevant part that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." General Statutes § 42-110b (a). "Connecticut courts, when determining whether a practice violates CUTPA, will consider (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen). . . . Thus, a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy." (Citation omitted; internal quotation marks omitted.) *Kenney* v. *Healey Ford-Lincoln-Mercury, Inc.*, supra, 53 Conn. App. 330.

"An act or practice is deceptive if three conditions are met. First, there must be a representation, omission, or other practice likely to mislead consumers. Second, the consumers must interpret the message reasonably under the circumstances. Third, the misleading representation, omission, or practice must be material—that is, likely to affect consumer decisions or conduct." (Internal quotation marks omitted.) *Southington Savings Bank* v. *Rodgers*, 40 Conn. App. 23, 28, 668 A.2d 733 (1995), cert. denied, 236 Conn. 908, 670 A.2d 1307 (1996). "Whether a practice is unfair and thus violates CUTPA is an issue of fact. . . . On appellate review, we overturn factual determinations only when they are clearly erroneous." (Citations omitted; internal quotation marks omitted.) *Calandro* v. *Allstate Ins. Co.*, 63 Conn. App. 602, 615, 778 A.2d 212 (2001).

Moreover, "[a] failure to disclose can be deceptive only if, in light of all the circumstances, there is a duty to disclose. . . . Regarding the duty to disclose, the general rule is that . . . silence . . . cannot give rise to an action . . . to set aside the transaction as fraudulent. . . . A duty to disclose will be imposed, however, on a party insofar as he voluntarily makes disclosure. A party who assumes to speak must make a full and fair disclosure as to the matters about which he assumes to speak." (Citations omitted; internal quotation marks omitted.) *Macomber* v. *Travelers Property & Casualty Corp.*, supra, 261 Conn. 635–36. Whether the defendants had a duty to disclose is a question of law and, thus, our review is plenary. Id.

We note initially that the court's conclusion that the defendants had a duty to disclose was legally and logically correct. In that respect, the court stated: "There is no question that the [plaintiffs] were under the impression that the defendants owned lot no. 31. The defendants at no time told the [plaintiffs] that they did not own the lot. As far as [the contractor] was concerned, it was none of the [plaintiffs'] business what his arrangement with the lot was. *But for the fact that the defendants were expecting the [plaintiffs] to come up with additional money at the closing to put toward the purchase of the lot, the defendants would have been correct.*" (Emphasis added.) Under those circumstances, the court's conclusion that the defendants had a duty to disclose their lack of ownership of the lot was legally and logically correct.

Next, we examine whether the court's finding that the defendants' conduct violated CUTPA was clearly erroneous.[3] The court found that "[j]ust before the June

[3] We note that contrary to the defendant's contention, a "CUTPA violation need not involve fraud on the part of the violator . . . . " *Lester* v. *Resort Camplands International, Inc.*, 27 Conn. App. 59, 71, 605 A.2d 550 (1992).

7, 1999 closing was to take place, the [plaintiffs] were told they had to come up with an additional $38,000 to supplement the bank's $57,000 in order for the defendants to purchase the lot from Trinity Ridge."

The court stated further that "[t]he problem with not owning the lot is that the defendants looked to the [plaintiffs] to make up any shortfall between what the bank allocated to the cost of the lot and the cost of the lot. This is in spite of the fact that the construction agreement entered into between the [plaintiffs] and the defendants did not provide for other than the $40,000 already given by the [plaintiffs]." On that record, we believe that the court's determination that the defendants' failure to disclose their lack of ownership of the lot was deceptive and material to their contractual breach was not clearly erroneous.

IV

The defendants' fourth claim is that the court improperly determined that their refusal to return the plaintiffs' deposit constituted the tort of conversion. We disagree.

As a preliminary matter, we note that the court's determination that the evidence supported the finding of conversion is subject to reversal only if it is clearly erroneous. *Aubin* v. *Miller*, 64 Conn. App. 781, 796, 781 A.2d 396 (2001).

The following additional facts are relevant to our discussion of the defendants' claim. The defendants argue in their reply brief that "the refusal to return the $40,000 deposit upon demand was not conversion because the plaintiffs did not demonstrate that the defendants wrongfully withheld the money." The defendants maintained that they had a legal claim to the deposit money at the time the plaintiffs allegedly breached the contract and that the plaintiffs had

demanded their money back.[4] Additionally, the defendants took issue with the court's conclusion that they had committed conversion by soliciting the money under false pretenses. The latter determination, the defendants claim, was factually unsupported.

To facilitate our discussion of the court's decision, we begin by reference to general legal principles regarding the tort of conversion. Generally, "[c]onversion is an unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights. . . . To establish a prima facie case of conversion, the plaintiffs had to establish that (1) the deposit given to the defendant belonged to the plaintiffs, (2) the defendant deprived the plaintiffs of their funds for an indefinite period of time, (3) the defendants' conduct was unauthorized and (4) the defendants' conduct harmed the plaintiffs." (Citation omitted; internal quotation marks omitted.) Id.

"[T]here are two general classes of conversion: (1) that in which possession of the allegedly converted goods is wrongful from the onset; and (2) that in which the conversion arises subsequent to an initial rightful possession." (Internal quotation marks omitted.) *Luciani* v. *Stop & Shop Cos.*, 15 Conn. App. 407, 410, 544 A.2d 1238, cert. denied, 209 Conn. 809, 548 A.2d 437 (1988).

The court correctly found that the defendants' initial retention of funds from the plaintiffs was improper. As

---

[4] By letter dated August 2, 1999, the plaintiffs' attorney advised the defendants that the plaintiffs would consider the contract "null and void" if the defendants did not return the plaintiffs' deposit by Friday, August 6, 1999. That was because, the letter stated, the defendants had failed to obtain all the necessary permits by April, 30, 1999, despite numerous reassurances that they had done so. The defendants' claim that the court should have treated the letter as an anticipatory breach is unavailing because the defendants already had breached the contract by failing to comply with the terms of the contract necessary to bring about the closing set for June 17, 1999.

noted by the court, the evidence supports the following conclusions: That the contractor had obtained the deposit of $41,000 from the plaintiffs under false pretenses by failing to disclose that his company, Guimaraes Construction, Inc., did not own lot 31; that when he told the plaintiffs that he had reserved lot 31 for himself, but had then decided to look for property in Avon, the plaintiffs reasonably understood the latter statement as an affirmation that he owned the lot; that, on the basis of his representations, the plaintiffs entered into a contract with the defendants for the sale and construction of a house on lot 31; and that on learning, through a title search, that the defendants did not own the lot, the plaintiffs, to no avail, repeatedly demanded that the defendants return their deposit.

In response, the defendants claimed that they, in fact, had legal title to lot 31 because they had obtained equitable title under the doctrine of equitable conversion. "Under the doctrine of equitable conversion . . . the purchaser of land under an executory contract is regarded as the owner, subject to the vendor's lien for the unpaid purchase price, and the vendor holds the legal title in trust for the purchaser." (Internal quotation marks omitted.) *Francis T. Zappone Co.* v. *Mark*, 197 Conn. 264, 267, 497 A.2d 32 (1985). That doctrine is unavailing to the defendants because they failed to show the existence of an executory contract between them and Trinity Ridge giving them any rights to the agreement between Trinity Ridge and the lot's legal owner.

The defendants argued further that even if they did not have equitable title, they had the right to offer the lot for sale pursuant to their standing oral agreement with Antonio Sabatini, the president of Trinity Ridge. Sabatini testified at trial that he had been willing at all times to sell lot 31 to the defendants. The defendants have cited no authority supporting their proposition

that Sabatini's stated willingness to sell lot 31 to either of the defendants, without any prior purchasing agreement with either of them, was sufficient to convey on either of them legal ownership of lot 31. Under those circumstances, the court's conclusion that the defendants had wrongfully converted the plaintiffs' funds was not clearly erroneous.

We next turn to the defendants' claim that there is a contradiction between the court's finding in an articulation that the defendants' statements "were sufficiently ambiguous to preclude a finding" of fraudulent nondisclosure and its finding that they had solicited the deposit under "false pretenses." Because the latter argument by the defendants requires us to discuss the fraudulent misrepresentation claim raised by the plaintiffs on their cross appeal, we will discuss that claim here as well.

The plaintiffs filed an amended complaint on November 15, 2000, to include an allegation of fraudulent concealment by the defendants of the fact that they did not own lot 31. Prior to that amendment, count one of the complaint alleged only fraudulent misrepresentation.

"Fraud consists [of] deception practiced in order to induce another to part with property or surrender some legal right, and which accomplishes the end designed. . . . The elements of a fraud action are: (1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on the statement to his detriment. . . . Additionally, [t]he party asserting such a cause of action must prove the existence of the first three of [the] elements by a standard higher than the usual fair preponderance of the evidence, which higher standard we have described as clear and satisfactory or clear, precise and unequivo-

cal." (Citation omitted; internal quotation marks omitted.) *Giulietti* v. *Giulietti*, 65 Conn. App. 813, 836, 784 A.2d 905, cert. denied, 258 Conn. 946, 947, 788 A.2d 95, 96, 97 (2001). The determination of what acts constitute fraud is a question of fact, and we similarly employ the clearly erroneous standard in reviewing the court's factual findings. See *Tanpiengco* v. *Tasto*, 72 Conn. App. 817, 819, 806 A.2d 1080 (2002).

The court opined that the plaintiffs had not proven their claim of fraudulent nondisclosure by clear, precise and unequivocal evidence. The court based its determination on its finding that when the contractor told the plaintiffs and Volpe that he was reserving the lot for himself, his statement was ambiguous enough to "preclude a finding by the court that a false representation, i.e., that he owned the lot, was made by Peter Guimaraes as a statement of fact." In light of the high burden of proof the plaintiffs had to meet to satisfy their claim of fraudulent misrepresentation, the court properly found that they had not proved that the defendants committed fraud. Given the high threshold of proof required for the plaintiffs to prove their claim of fraudulent misrepresentation, the court's conclusion by a fair preponderance of evidence that the defendants had solicited the deposit under "false pretenses" was not inherently inconsistent with its finding regarding the plaintiffs' allegations of fraud. Thus, the court's finding was not clearly erroneous.

V

The defendants' last claim is that the court improperly awarded attorney's fees and costs. We agree as to the defendants' claim regarding costs, but not as to the award of counsel fees.

The following additional facts are relevant to our discussion of the defendants' claims regarding counsel fees and costs. After the trial on the merits, the court

conducted a hearing to determine counsel fees as permitted under CUPTA. Subsequently, the court ordered counsel fees in the amount of $37,687.50, which included the $3000 due to predecessor counsel. Additionally, the court awarded fees of $1000 for an expert witness who testified as to the reasonable value of counsel fees.

"It is a settled principle of our common law that parties are required to bear their own litigation expenses, except as otherwise provided by statute. . . . Furthermore, because [c]osts are the creature of statute . . . unless the statute clearly provides for them courts cannot tax them." (Citation omitted; internal quotation marks omitted.) *M. DeMatteo Construction Co.* v. *New London*, 236 Conn. 710, 715, 674 A.2d 845 (1996). "Awarding . . . attorney's fees under CUTPA is discretionary; General Statutes § 42-110g (a) and (d) . . . and the exercise of such discretion will not ordinarily be interfered with on appeal unless the abuse is manifest or injustice appears to have been done." (Internal quotation marks omitted.) *Thames River Recycling, Inc.* v. *Gallo*, 50 Conn. App. 767, 800, 720 A.2d 242 (1998).

The core of the defendants' claim regarding the award of counsel fees is that a portion of the counsel fees awarded by the court, the sum of $3000, related to a previous case brought by predecessor counsel that had been dismissed because of a failure of service of process. In response, the plaintiffs argued that much of the work done by predecessor counsel in the previous action had been beneficially used by counsel in this action, and that without the use of the effort by predecessor counsel, counsel fees in this matter would have been greater.

On the basis of our review of the record and the court's memorandum of decision, we conclude that the court did not abuse its discretion by including the sum

of $3000 in its total counsel fees award. We find no statutory or discretionary basis, however, for the court's award of $1000, as taxable costs for an expert who was an attorney. General Statutes § 52-260, relating to witness fees, sets forth the court's authority to award expert witness fees in civil litigation. Within the statute, there is an enumeration of the categories of experts entitled to a discretionary award of expert witness fees. Legal experts are not included within that enumeration. Accordingly, we conclude that the court was without authority to award, as fees, the sum of $1000 for the expert who testified as to the reasonable fees to be awarded to the plaintiffs' counsel.

The judgment is reversed only as to the award of $1000 in expert witness fees and the case is remanded with direction to vacate that order. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.