******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

APPENDIX

## LPP MORTGAGE LTD. *v.* UNDERWOOD TOWERS LIMITED PARTNERSHIP ET AL.*

Superior Court, Judicial District of Hartford,
Complex Litigation Docket
File No. X03-CV-07-5007994-S

Memorandum filed July 16, 2019

*Proceedings*

Memorandum of decision in commercial foreclosure action. *Judgment for plaintiff in part.*

*Thomas W. Witherington, Nicholas P. Vegliante, John G. McJunkin*, pro hac vice, and *J. David Folds*, pro hac vice, for the plaintiff.

*Richard P. Weinstein*, for the named defendant et al.

*Opinion*

TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | HISTORY AND BACKGROUND . . . . . . . | 775 |
| II. | NOTE B . . . . . . . . . . . . . . . . . . . . . | 779 |
| III. | DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING . . . . . . . . . . . . . | 781 |
| | A. Claim that Plaintiff Never Had Possession of Note B . . . . . . . . . . . . . | 782 |
| | B. Claim that Plaintiff Did Not Prove that Note B is lost and that Plaintiff is the Owner of the Debt . . . . . . . . . . . | 786 |
| | 1. Proof that Note B was Lost . . . . . | 786 |
| | 2. Proof that Plaintiff is the Owner of the Debt . . . . . . . . . . . . . . . . | 788 |
| IV. | COUNT ONE: FORECLOSURE. . . . . . . . | 789 |
| | A. Ownership. . . . . . . . . . . . . . . . | 789 |
| | B. Default. . . . . . . . . . . . . . . . . . | 791 |
| | 1. Kaye Skinner's Services. . . . . . . . | 795 |
| | 2. Management Fees . . . . . . . . . . . | 798 |
| | 3. John Scobie's Compensation. . . . . | 801 |
| | a. Violation of the HUD Handbook | 803 |
| | b. Improper Distribution to a Partner Under the Second Mortgage | 804 |
| | c. The Salary Was Not a Reasonable and Necessary Operating Expense. . . . . . . . . . . . . . | 806 |
| | 4. Nicholas Carbone's Apartment. . . . | 807 |
| | 5. Capital Assets . . . . . . . . . . . . . | 811 |
| | 6. Legal Fees . . . . . . . . . . . . . . . | 817 |
| | C. Conditions Precedent . . . . . . . . . . | 819 |
| | D. Special Defenses . . . . . . . . . . . . . | 820 |
| | E. Foreclosure Conclusion . . . . . . . . . | 822 |
| V. | COUNTS TWO THROUGH TEN . . . . . . . | 823 |
| | A. Count Two: Breach of Contract . . . . | 828 |
| | B. Count Three: Breach of Covenant of Good Faith and Fair Dealing . . . . . . | 829 |
| | C. Count Four: Conversion . . . . . . . . . | 830 |
| | D. Count Five: Statutory Theft . . . . . . . | 832 |
| | E. Count Seven: Unjust Enrichment. . . . | 833 |
| | F. Count Nine: Fraud . . . . . . . . . . . . | 834 |
| | G. Count Ten: Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.. . . . . . . . . . . | 835 |
| VI. | CONCLUSION . . . . . . . . . . . . . . . . . | 836 |

SCHUMAN, J. The substitute plaintiff, LPP Mortgage, Inc. (plaintiff), has filed a ten count, Second Amended Complaint (complaint) (Docket Entry (Entry) #562.00) seeking foreclosure in the first count and money damages for various breaches in the remaining counts. The principal defendants are Underwood Towers Limited Partnership (Underwood) and its management agent, CDC Management Company (CDC) (collectively, defendants).[1] The court granted the defendants' motion for summary judgment on counts six and eight of the com-

plaint. (Entry #662.00, p. 19.) The defendants have filed a second amended answer, denying the plaintiff's claims and raising twenty-two special defenses. (Entry #715.00.) A court trial of these claims took place over eighteen days in January, February, and March, 2019. The parties completed the filing of briefs on June 5, 2019. This memorandum constitutes the decision in the case.

## I

## HISTORY AND BACKGROUND

Unfortunately, this case has a long and tortuous history. The court finds the following facts based on the undisputed parts of the record and on the testimony and the exhibits that it credits.

Underwood is a limited partnership, whose sole asset is the subject property—Park Place Towers. In 1985, Underwood leased 6.34 acres of property owned by the defendant city of Hartford in order to construct a high-rise apartment complex in the Frog Hollow neighborhood southwest of downtown Hartford. (Exhibit (Ex.) 1137, p. 32.) The ground lease called for an annual rental fee of $1 for ninety-nine years. Once built, Park Place Towers (Park Place) constituted two high-rise buildings, each containing twenty-five stories. There were a total of 451 apartments, consisting of 153 one-bedroom, 287 two-bedroom, and 11 three-bedroom units. The apartments were generally of the market rate nature with only a limited amount of low-income housing. (Scobie, 03/18/09, pp. 57–58.)[2] There was also a commercial space on the ground floor of one of the apartments.

The funding for the construction of the project came from a $35 million first mortgage loan given to Underwood by Connecticut National Bank. The mortgage was insured by the United States Department of Housing and Urban Development (HUD). To obtain the mortgage insurance, Underwood entered into a Regulatory Agreement with HUD (regulatory agreement) that governed the management of the project and its revenue. (Ex. 1.)

In 1990, the mortgage and note were assigned to the defendant Greystone Servicing Corporation, Inc. (Greystone). Shortly thereafter, Underwood defaulted. HUD then paid approximately $18.5 million to Greystone as a partial payment of the claim (PPC),[3] and Underwood executed a second mortgage and a second mortgage note, known as Note A, in favor of HUD.[4] Underwood defaulted again on the first mortgage beginning in 1993 because of the bad economy and sluggish rental market. (Scobie, 3/18/09, p. 72; Ex. 36, pp. 2–3.) In an effort to forestall foreclosure, Underwood, in 1995, applied for a second PPC, whereby HUD would make a payment of approximately $13.9 million to the first mortgagee to reduce (although not eliminate) the unpaid balance. (Scobie, 3/18/09, p. 73; 3/19/09, p. 8; Ex. 36, p. 4.) HUD accepted and, in 1996, Underwood executed an addi-

tional mortgage note with HUD, known as Note B, for the $13.9 million and agreed to modifications to the second mortgage. (Exs. 10, 37.) The combined original principal amounts of Note A and Note B exceeded $30 million.

HUD sold the second mortgage to PAMI MidAtlantic, LLC (PAMI), in 2002, and, instead of providing the original Note B, provided a lost note affidavit. PAMI assigned the mortgage back to HUD in 2005 and returned the lost note affidavit (Ryan, 09/21/09, pp. 18–19, 107.)[5] HUD then sold the mortgage, including both Notes A and B, to Beal Bank (Beal) in 2005 for approximately $3.6 million. (Odean, 2/17/09, p. 141; 12/20/09, pp. 19–20.) The sale was documented by, among other papers, a Loan Sale Agreement. Beal never had possession of the original Note B. (Odean, 2/19/09, p. 81.) The plaintiff acquired the second mortgage in January, 2006, from Beal, although Beal continued to service the loan until 2008. (Odean, 2/6/09, pp. 48–50; Ex. 30.)

Beginning in August, 2005, Beal sent Underwood letters requesting additional information about Underwood's allocation of rental income. In January and February, 2006, Beal wrote Underwood to request payment of $419,246 that Underwood had allegedly diverted improperly. The plaintiff declared a default on Note B by letters dated March 28 and May 2, 2006, and demanded payment of $419,246 and $1,146,245.98, respectively, which it claimed represented the amount of "Net Cash" the defendants had failed to pay. (Exs. 67, 68, 70, 73, 75, 77, 79, 85.) By letter dated June 14, 2006, the plaintiff also gave notice that, because Underwood had not cured the default, the plaintiff had accelerated the debt. The plaintiff at that time demanded payment of the entire principal amounts on Notes A and B, together with accrued interest, which totaled approximately $68 million. (Ex. 87.)

Meanwhile, on May 30, 2006, Underwood filed suit against Beal and the plaintiff, seeking a declaration of the rights of the parties in the first count, and liability and damages in two additional counts. See *Underwood Towers, Ltd. Partnership* v. *Beal Bank*, Superior Court, judicial district of Hartford, Docket No. CV-06-5004189-S. That case remains informally stayed pending the outcome of the present case.

The plaintiff filed the present action for foreclosure and damages in December, 2006. The parties tried the case to the court, *Miller, J.*, beginning in February, 2009. Testimony proceeded intermittently and did not end until January, 2011. There were then extensive briefs and delays that postponed full submission of the case until January, 2017. Judge Miller then sought numerous extensions of the 120 day decisional period. By June 1, 2018, the defendants declined to consent to further extensions and instead moved for a mistrial. On July 25, 2018, the court, *Hon. Patty Jenkins Pittman*, judge

trial referee, granted the motion for a mistrial. The case was at that time reassigned to the undersigned.

Prior to retrial, the court filed an extensive ruling granting and denying in part various summary judgment motions and motions in limine filed by the parties. (Entry #662.00.) A retrial of the case before the court took place over eighteen trial days in January, February, and March, 2019. The trial addressed the plaintiff's claim of damages for the period from January 1, 2000 through December 31, 2008, which the court will refer to as the "trial period." The plaintiff claims that, as of December 1, 2018, the total indebtedness on Note A, including unpaid principal and accrued interest, is approximately $65.7 million and on Note B is approximately $36.7 million. (Ex. 1121.) Because Note B is senior in priority to Note A, this case, in the first instance, addresses issues involving Note B. (Odean, 2/6/09, p. 80.)[6]

## II

## NOTE B

In Note B, Underwood promised to pay the Secretary of HUD or "his successors and assigns" the principal sum of $13,919,109.58 with interest at the annual rate of 6.74 percent. (Ex. 10, p. 1.) Note B creates what is known as a "net cash" mortgage between the plaintiff and Underwood. Instead of making periodic, defined payments of principal and interest, Underwood must pay its monthly "net cash" to the lender. Note B states: "Net cash shall be calculated monthly and any payments to be made hereunder out of Net Cash shall be payable on the first (1st) day of the month." (Ex. 10, p. 2.)

To determine the formula for "net cash," one must start with Note B's concept of "Net Operating Income." As defined by Note B, "Net Operating Income" is "the amount remaining after subtracting from the gross revenue derived from the Project during such calendar year the operating and maintenance expenses of the Project,[7] exclusive of debt service payments due under the First Note,[8] the Additional Note A Payments (as defined in Note A), the Additional Note B Payments . . .[9] and all required Base [payments in lieu of taxes (PILOT)] PILOT Payments." (Footnotes added.) (Ex. 10, p. 2.) "Net cash" is then calculated by subtracting from the "Net Operating Income" the sum of the following five items: "(i) all contributions, if any, to the Project's reserve for replacements account; (ii) debt service on the First Note . . . (iii) the Minimum Note B payments . . .[10] (iv) all semi-annual payments required to be made by the Maker to the City of Hartford, Connecticut (the 'City') equaling [sic] in the aggregate $36,144 per annum (the 'Base PILOT Payments') . . . and (v) escrow deposits for real estate taxes and/or payments in lieu of taxes, hazard insurance premiums and mortgage insurance premiums due hereunder." (Footnote added.) (Ex. 10, pp. 2–3.)

Thus, a fair formula for the determination of net cash might look as follows:

Gross Revenue

– Operating and Maintenance Expenses

= Net Operating Income

– Reserve replacement contributions, debt service on the first note, minimum Note B payments, PILOT payments to Hartford, escrow deposits for taxes and insurance

= Net Cash.

Note B contains the following nonrecourse clause: "Neither the Maker nor any of its general or limited partners, from time to time, shall have any personal liability for the payment of the indebtedness evidenced by this Note B or for the performance of the obligations herein or in the other Second Loan Documents, except as expressly set forth in the Second Mortgage." (Ex. 10, para. K.) In this case, the plaintiff is not seeking a deficiency judgment or other personal liability against Underwood for the indebtedness under Note B. Rather, the plaintiff seeks the equitable remedy of foreclosure and the legal remedy of damages, the latter purportedly based on alleged violations of provisions in the second mortgage and the other loan documents.

### III

### DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING

The defendants initially move to dismiss on the ground that the plaintiff lacks standing to enforce Note B because it never had possession of that note. In the alternative, the defendants assert that the plaintiff lacks standing because it has not proven that Note B is lost and that the plaintiff was the owner of the underlying debt. This motion is timely because standing relates to subject matter jurisdiction and thus can be raised at any time; see *U.S. Bank, National Assn.* v. *Schaeffer*, 160 Conn. App. 138, 145, 125 A.3d 262 (2015); Practice Book § 10-33; and also because the defendants repeatedly raised this issue during the trial but, with court permission, have deferred briefing it until the conclusion of the case.

### A

### Claim that Plaintiff Never Had Possession of Note B

The defendants' first argument is that the plaintiff lacks standing because it never had possession of Note B. As mentioned, when HUD sold the loans to PAMI in 2002, HUD provided PAMI a lost note affidavit, and the note apparently was not found at the time that HUD resold the loan to Beal in 2005. Exhibit 10 is a true and accurate copy of the original Note B. (Hubbard direct;

Ex. 1159A.)

Both sides debate the applicability of *New England Savings Bank* v. *Bedford Realty Corp.*, 238 Conn. 745, 680 A.2d 301 (1996) (*Bedford Realty*). In *Bedford Realty*, the mortgagor, Bedford Realty Corporation, relied on the Uniform Commercial Code (UCC) to argue that, "if the promissory note is lost, a mortgagee can foreclose only if it satisfies the conditions set forth in [General Statutes] § 42a-3-309, which require the party seeking to enforce a lost note to show that he or she was in possession of the note at the time it was lost." Id., 759.[11] The Supreme Court rejected that argument. It initially observed that, "[i]t is well established [however] that the [mortgagee] is entitled to pursue its remedy at law on the notes, or to pursue its remedy in equity upon the mortgage, or to pursue both. A note and a mortgage given to secure it are separate instruments, executed for different purposes and in this [s]tate action for foreclosure of the mortgage and upon the note are regarded and treated, in practice, as separate and distinct causes of action, although both may be pursued in a foreclosure suit." (Internal quotation marks omitted.) Id. The court then applied this rule to the situation before it: "Because [mortgagee GHR D.C., Inc. (GHR)] has chosen to pursue the equitable action of foreclosure of the mortgage, rather than a legal action on the note, the fact that GHR never possessed the lost promissory note is not fatal to its foreclosure of the mortgage. Moreover, GHR has not sought a deficiency judgment. Thus, whatever restrictions [General Statutes] §§ 42a-3-301 and 42a-3-309 might put upon the enforcement of personal liability based solely upon a lost note, they do not prohibit GHR from pursuing an action of foreclosure to enforce the terms of the mortgage." Id., 759–60.[12]

The situation here is similar because, in count one, the plaintiff is seeking foreclosure of the mortgage rather than suing on Note B or for a deficiency based on the note. The defendants nonetheless attempt to distinguish *Bedford Realty* on two grounds. First, the defendants note that, in *Bedford Realty*, the original mortgagee who lost possession of the note commenced the action and thereafter assigned the debt to the ultimate plaintiff (GHR) whereas in the present action, the original plaintiff—LPP—never had possession of the note. The defendants contend that this distinction conforms *Bedford Realty* to Appellate Court case law stating that, "[g]enerally, in order to have standing to bring a foreclosure action the plaintiff must, at the time the action is commenced, be entitled to enforce the promissory note that is secured by the property." (Internal quotation marks omitted.) *Deutsche Bank National Trust Co.* v. *Bliss*, 159 Conn. App. 483, 488, 124 A.3d 890, cert. denied, 320 Conn. 903, 127 A.3d 186 (2015), cert. denied,      U.S.     , 136 S. Ct. 2466, 195 L. Ed. 2d 801 (2016).[13] The defendants' theory rests on the assumption that § 42a-3-309 and the UCC apply to a

party seeking foreclosure, and, that, therefore, the original plaintiff must have had possession of the note before it became lost. However, the language of *Bedford Realty* strongly suggests that the UCC simply does not apply to a plaintiff seeking only foreclosure and not seeking a remedy under the note. See *New England Savings Bank* v. *Bedford Realty Corp.*, supra, 238 Conn. 760 ("whatever restrictions §§ 42a-3-301 and 42a-3-309 might put upon the enforcement of personal liability based solely upon a lost note, they do not prohibit GHR from pursuing an action of foreclosure to enforce the terms of the mortgage"). A further response to the defendants' first basis for distinguishing *Bedford Realty* stems from the rule that the plaintiff in a foreclosure case must maintain standing throughout the case. See *Yanow* v. *Teal Industries, Inc.*, 178 Conn. 262, 286, 422 A.2d 311 (1979) (plaintiff in derivative suit required to maintain shareholder status "continuously and uninterruptedly until after the judgment in the case was rendered"); *Salem Five Mortgage Co., LLC* v. *Afsary*, Superior Court, judicial district of Stamford-Norwalk, Docket No. CV-12-6013158-S (June 26, 2014) (58 Conn. L. Rptr. 484, 490) (in foreclosure action in which substituted plaintiff replaced original plaintiff, "[s]tanding was therefore maintained throughout the case, from commencement until judgment"). Thus, in ruling that plaintiff GHR could pursue a foreclosure action despite the fact that it never possessed the note, the Supreme Court at least implicitly acknowledged that GHR had standing. The same is true here for the plaintiff.

The defendants also attempt to distinguish *Bedford Realty* on the ground that it did not address General Statutes § 42a-3-310 (b) (4) of the UCC. The applicable portion of that section provides: "If the obligee is the person entitled to enforce the instrument but no longer has possession of it because it was lost, stolen, or destroyed, the obligation may not be enforced to the extent of the amount payable on the instrument, and to that extent the obligee's rights against the obligor are limited to enforcement of the instrument."[14] The defendants claim that under this provision the plaintiff cannot enforce the "amount payable on the instrument," which is the underlying debt. However, the provision expressly applies only to a "person entitled to enforce the instrument," a category that would exclude the plaintiff in the first place under § 42a-3-309 because it never had possession of the lost note. See *Seven Oaks Enterprises, L.P.* v. *DeVito*, 185 Conn. App. 534, 552, 198 A.3d 88 (under § 42a-3-309, the "only person who can enforce the note is the person in possession of the note when it was lost"), cert. denied, 330 Conn. 953, 197 A.3d 893 (2018). Thus, § 42a-3-310 (b) (4) simply does not apply in this case. Rather, *Bedford Realty* controls and affirms that the plaintiff has standing to bring this foreclosure action.

The defendants also express concern that *Bedford*

*Realty* is contrary to public policy because it creates a risk of double recovery if a person or entity later recovers the lost note and attempts to sue Underwood. This court, of course, is bound by the decisions of our state Supreme Court and cannot decline to follow them on the ground that there may exist contrary public policy concerns. See *Jolly, Inc.* v. *Zoning Board of Appeals*, 237 Conn. 184, 195, 676 A.2d 831 (1996). In any event, there is no meaningful risk of double recovery here. As the court has stated and the defendants emphasize, Note B is a nonrecourse note and therefore a party cannot properly sue Underwood individually for liability or a deficiency on the note. Accordingly, the court holds that, under *Bedford Realty*, the fact that the note is lost does not deprive the plaintiff of standing to maintain this foreclosure action.[15]

## B

Claim that Plaintiff Did Not Prove that Note B
is Lost and that Plaintiff is the Owner
of the Debt

### 1

Proof that Note B was Lost

In the alternative, the defendants assert that the plaintiff did not prove that Note B was lost and that the plaintiff received ownership interests in the underlying debt from HUD and Beal. There is no merit to the initial claim that the plaintiff did not prove that Note B was lost. First, the defendants admitted in court that the note was lost.[16] Second, a HUD representative executed an Assignment and Lost Note Affidavit on February 5, 2003, at the time of the assignment to PAMI, stating that Note B was believed to be in a fireproof safe at HUD, that a diligent search failed to locate the note, and that HUD did not assign the note to anyone else. (Ex. 22.) In 2005, following the sale of the loans back to HUD, a HUD representative executed an assignment to Beal and incorporated a similar lost note affidavit. (Ex. 29.) Beal's Vice President then submitted a lost note affidavit at the time of the assignment of the loan to the plaintiff. (Ex. 32.) Although the defendants challenge these documents as hearsay and unreliable, the court finds them admissible and trustworthy in that the HUD documents are public records and all the documents are under oath. See Conn. Code Evid. §§ 8-3 (7) and 8-9. Further, given that the loss of Note B makes the plaintiff's proof more difficult in this case, the lost note affidavits essentially constitute admissions against civil interest, which bear added credibility. See Conn. Code Evid. § 8-6 (3). Based on these factors, the plaintiff sufficiently proved that Note B was lost.

### 2

Proof that Plaintiff is the Owner of the Debt

The defendants also contest the chain of passage of

the mortgage and the debt from HUD to the plaintiff. As for the second mortgage, the record contains a complete chain of recorded assignments from HUD to PAMI in December, 2002 (Ex. 21), from PAMI to HUD in January, 2005 (Ex. 23), from HUD to Beal in March, 2005 (Ex. 28), and from Beal to the plaintiff in February, 2006. (Ex. 31.)

With regard to the debt, exhibits 21 and 23 recite the endorsement of Note A from HUD to PAMI and PAMI to HUD. (Exs. 21, 23.) In addition, the plaintiff presented in court the original Note A, which contained endorsements from HUD to Beal and Beal to the plaintiff (2/5/19, p. 18.) Thus, there is a complete chain of title for Note A.

As for the loan evidenced by Note B, exhibit 22 recites its assignment from HUD to PAMI in February, 2003. HUD's lost note affidavit recites the assignment of Note B from HUD to Beal in 2005. (Ex. 29.) Beal's lost note affidavit documents Beal's assignment of Note B to the plaintiff in 2006. (Ex. 32.)

There is no one document establishing the transfer of Note B from PAMI back to HUD in 2005. However, the evidence clearly establishes that this transfer took place. First, it is inconceivable that HUD would have transferred the interest in Note B to Beal in March, 2005, if HUD had not received the rights to Note B from PAMI several months earlier. Second, Ann Ryan, an attorney for PAMI, testified by deposition that she transferred the original lost note affidavit for Note B, along with all the other loan documents, back to HUD beginning in late 2004 for the sum of approximately $10.5 million. (Ryan, 9/21/09, pp. 18, 32–33, 39–42, 58, 70–71.) Third, Underwood's own financial statements from 2005 to 2008 contain the following admission: "The second mortgage, held by Beal Service Corporation ('Beal') secures two notes. (Notes 'A' and 'B.') At the beginning of 2005, the second mortgage was held by TriMont Advisors, Inc. ('Trimont'). It was bought by HUD and subsequently resold to Beal." (Exs. 222–24, p. 12; Ex. 820, p. 9.) Given that Trimont was the servicer for PAMI; (Ryan, 9/21/09, p. 14); this statement essentially acknowledges that ownership of the Note B debt passed from PAMI back to HUD before its resale to Beal. Finally, during the entire trial period, Underwood made regular monthly payments of net cash to HUD, PAMI, Beal, and the plaintiff, successively. (Witt, 1/17/19, pp. 76–78.) Because these payments, as stated, served to reduce the interest on Note B, the payments essentially constitute a waiver of any challenge to the plaintiff's ownership of the Note B debt. See *SKW Real Estate Ltd. Partnership* v. *Gallicchio*, 49 Conn. App. 563, 571, 716 A.2d 903 ("[h]ere, even without endorsement, when the plaintiff had lawful possession of the note and mortgage, and the defendants made payments according to the terms of the note to the plaintiff for nineteen months, the plaintiff was entitled to enforce the note"), cert. denied, 247 Conn.

926, 719 A.2d 1169 (1998). For all these reasons, the court concludes that the plaintiff proved a complete chain of title for its ownership of the debt underlying Note B.[17] The court accordingly denies the motion to dismiss.

## IV

## COUNT ONE: FORECLOSURE

### A

### Ownership

Our courts have stated that, "[i]n order to establish a prima facie case in a mortgage foreclosure action, the plaintiff must prove by a preponderance of the evidence that it is the owner of the note and mortgage, that the defendant mortgagor has defaulted on the note and that any conditions precedent to foreclosure, as established by the note and mortgage, have been satisfied." *GMAC Mortgage, LLC* v. *Ford*, 144 Conn. App. 165, 176, 73 A.3d 742 (2013). In contrast to stating that the first element involves ownership of the "note and mortgage," the plaintiff's brief makes the somewhat different statement that the plaintiff must prove that it owned the "debt and the mortgage." (Pl. Br., p. 16.) The court nonetheless believes that the plaintiff's statement is an acceptable summary of the law. As stated in *Bedford Realty*: "A bill or note is not a debt; it is only primary evidence of a debt; and where this is lost, impaired or destroyed bona fide, it may be supplied by secondary evidence. . . . The loss of a bill or note alters not the rights of the owner, but merely renders secondary evidence necessary and proper. . . . GHR or its assignee is free to present reliable evidence other than the original promissory note to establish the amount of the debt." (Citations omitted; internal quotation marks omitted.) *New England Savings Bank* v. *Bedford Realty Corp.*, supra, 238 Conn. 760. Thus, the key in a mortgage foreclosure case such as the present one, in which the plaintiff seeks the equitable remedy of foreclosure and not recovery on the note or a deficiency judgment, is ownership of the underlying debt. See also *U.S. Bank, National Assn.* v. *Schaeffer*, supra, 160 Conn. App. 146–47 ("to seek enforcement of a note through foreclosure, a holder must be able to demonstrate it is the owner of the underlying debt . . . [and] a holder of a note is presumed to be the rightful owner of the underlying debt" (emphasis omitted)).

The defendants' argument that the plaintiff did not prove the first element—that the plaintiff owned the debt and the mortgage—is entirely encompassed within the various arguments advanced by the defendants in support of their motion to dismiss. Having rejected those arguments, the court finds that the plaintiff, through its proof of ownership of the mortgage and of the debt underlying Note B, has proven the first element of its foreclosure count. Therefore, the court turns to a discussion of the other two elements.

### B

## Default

Note B does not directly define what constitutes a default. It does, however, contain an acceleration clause that provides that, "[i]f default be made in the payment of any installment under this Note B and if such default is not cured prior to the due date of the next installment, the entire principal sum and accrued interest due hereunder shall at once be due and payable, without notice, at the option of the holder hereof." (Ex. 10, p. 4.) In turn, the concept of an "installment" or "Installment Payments" on Note B has two components, as explained previously. The first, entitled "Minimum Note B Payments," consists of a monthly "service charge" of one-half of 1 percent of the unpaid principal balance on the note. (Ex. 10, p. 3.) The second part, labeled the "Additional Note B Payments," consists of monthly "installments of principal and interest [that are] due and payable to the extent of Net Cash . . . ." (Ex. 10, p. 3.) This case primarily addresses issues concerning this second part.

Note B also defines the concept of a "Material Violation." A "material violation" applies to breaches of "any of the Second Loan Documents, or any regulatory provisions governing [the] Loan or the operation of the Project . . . ." (Ex. 10, p. 4.) A "Material Violation" includes the "unauthorized use of Project assets for other than reasonable and necessary Project operating expenses."[18] Although the note does not explicitly state that a material violation constitutes a default, it does provide that a material violation can result in an increase in the interest rate to 8.875 percent. (Ex. 10, p. 4.)

Our Supreme Court has accepted a general definition of default as an "omission of that which ought to be done," or, alternatively, "neglect or failure of any party to take step[s] required of him in [the] progress of [a] cause." (Internal quotation marks omitted.) *Steve Viglione Sheet Metal Co.* v. *Sakonchick*, 190 Conn. 707, 710 n.4, 462 A.2d 1037 (1983), quoting Black's Law Dictionary (4th Ed. 1968). Under these circumstances, it is fair to conclude that the use of project revenues for purposes other than reasonable and necessary project expenses constitutes not only a material violation but also a default.

Using a similar approach, the plaintiff advances six categories of improper expenditures that it claims, in each case, constitutes a default.[19] As a general matter, the defendants do not dispute the fact that they used operating revenues for these expenditures but, rather, contest the alleged impropriety of doing so. The defendants also make four preliminary objections: first, that the plaintiff has no right to enforce the regulatory agreement, HUD regulations, or the HUD handbook; second, that the plaintiff has no right to enforce representations made in negotiations during the second default restructuring or PPC; third, that the plaintiff cannot rely on defaults that arose before it became the assignee; and

fourth, that HUD's acceptance of the defendants' alleged defaults constitutes a waiver of or creates an estoppel against the plaintiff's assertion of them now. The court addresses these preliminary objections before discussing the alleged substantive violations.[20]

In its summary judgment ruling, the court addressed and rejected the defendants' claims that the regulatory agreement and HUD rules and handbooks do not apply in this case. (Entry #662.00, pp. 8–12.) Among other grounds, the court cited the fact that the second mortgage—which the plaintiff indisputably holds—incorporates the regulatory agreement on several occasions and specifically provides that Underwood may collect rents for "use in accordance with the provisions of the Regulatory Agreement." If the regulatory agreement were no longer in effect, this important constraint on the defendants' use of the plaintiff's rental income would not exist, and the defendants might be free to misuse project funds. In addition, as the trial revealed, the defendants are still paying the first mortgage to Greystone, which HUD continues to insure. (Odean, 2/17/09, p. 15; 2/18/09, p. 122; 2/19/09, p. 90.) John Scobie, the general manager of Underwood, and Irwin Witt, the chief financial officer of CDC, in fact testified that Underwood maintained compliance with the regulatory agreement because of HUD's continuing role in insuring the first mortgage. (Scobie, redirect; Witt direct.) Further, as the court will discuss, the defendants themselves occasionally rely on provisions of the HUD handbook to support their contention that, substantively, no default occurred in this case. For all these reasons, the court adheres to its ruling that the regulatory agreement and HUD rules and handbooks apply to this case.

The defendants' second preliminary objection is to the use of the plaintiff's theory that the defendants "bargained away" their rights in representations they made in 1995 at the time of the second PPC. The court need not dwell on this objection because, as will be seen, it rejects the plaintiff's principal use of this theory with regard to the use of project revenues to pay capital expenses. The court does, however, believe it important to examine the past practice of the parties to help determine what the parties accepted as reasonable and ordinary operating expenses.

The defendants next object to the plaintiff's reliance on defaults that took place before the assignment of the mortgage and note to the plaintiff in January, 2006. The fact of the matter, however, is that, in all six categories, the defaults began before the assignment and continued after the assignment. There does not appear to be a valid policy basis for barring reliance on defaults that essentially represent continuing violations. Although there is no Connecticut appellate authority precisely on point, in *LPP Mortgage, Ltd.* v. *Lynch*, 122 Conn. App. 686, 1 A.3d 157 (2010), the court did uphold

an award to a mortgagee of prejudgment interest based on defaults and the " 'wrongful detention' " of money that began before the mortgagee's acquisition of the debt. Id., 689, 695. The court accordingly overrules this objection.

The defendants' final preliminary argument against default is that HUD's acceptance of the defendants' alleged defaults constitutes a waiver of or creates an estoppel against the plaintiff's assertion of them now. Because the defendants did not raise this argument in their opening brief and instead assert it for the first time in their reply brief, the court considers it abandoned. See *State* v. *Devalda*, 306 Conn. 494, 519 n.26, 50 A.3d 882 (2012). The defendants aggravate the procedural default by simply mentioning the concept of estoppel in their subsection caption but not briefing it, even in their reply brief. (Def. Reply Br., pp. 6–7.) Moreover, the court already rejected this argument in its summary judgment ruling. There, the court observed that the mortgage contains the following all-encompassing nonwaiver clause: "That no waiver of any covenant herein or of the Note secured hereby shall at any time thereafter be held to be a waiver of the terms hereof or of the Note secured hereby . . . ." (Pl. Ex. 6, ¶ 17.) Based on this broad nonwaiver provision, the court again finds that any acceptance of the defendants' alleged defaults by HUD does not bar the plaintiff from relying on them now.

As part of the same objection, the defendants assert that HUD's "course of dealing" with the defendants gives the most reliable evidence of what the parties understood the mortgage contract to require. This assertion is not so much an objection to a declaration of default as it is a rule of interpretation of what constitutes a default. The court does not disagree that HUD's interpretation of the mortgage and its dealings with the defendants is relevant to the determination of default, and, as stated, the court will consider the past practice of the parties in determining what the parties accepted as reasonable and ordinary operating expenses.

The court now turns to the specific grounds for default alleged by the plaintiff.

1

Kaye Skinner's Services

The first default alleged in the complaint is that "Underwood used the revenues from the Project to make unauthorized payments to a 'management consultant' . . . [and] allowed a consultant to live at the Project without paying rent." (Complaint, ¶ 31.) These allegations refer to Kaye Skinner. Skinner has been the facilities manager at Park Place from approximately 1993 to the present time. Through 2007, Underwood characterized her in its financial reports as a consultant, a status that Skinner requested because of other consulting work she hoped

to do. For 2008, she requested that Underwood change her status to employee because of tax concerns. Underwood did so.

For 2000 and 2001, Skinner received a bonus of $7500 and $9000, respectively. For the years 2002 through 2007, Skinner received annual compensation of approximately $46,000 plus a bonus growing progressively from $9000 in 2002 to $25,000 in 2007. (Ex. 338.) Skinner received a rent-free apartment at Park Place throughout this time period but no other benefits. In 2008, when Skinner became an employee, she continued to receive the rent-free apartment and the same financial remuneration but also began to receive health insurance and other employee benefits. (Scobie, 3/19/09, p. 41.) She testified that her financial package in 2008 was better, because of these additional benefits, than the one she received in 2007.

The plaintiff initially claims that the defendants improperly concealed Skinner's status as an independent contractor and that its invoices for bonuses did not reveal the true nature of the payments. However, Skinner received a 1099 tax form that reflects her monetary compensation. Various annual financial statements disclose the fact that the defendants were paying consulting fees and granting the use of an administrative rent-free apartment. (Odean, 2/17/09, p. 96 (agreeing that the consulting fees were "set forth in the financials"); Adams, 6/26/08, pp. 174–77; Exs. 217–25, p. 19; Exs. 226, 288, 417–19.)

The plaintiff's more important objection is that the bonus and the rent-free apartment should not have counted as reasonable operating expenses and thus reduced the amount of net cash.[21] Initially, however, the plaintiff points to no specific prohibition in the HUD handbook or any of the loan documents on paying bonuses or providing rent-free apartments to consultants.

The plaintiff argues instead that the bonus and apartment were not "reasonable and necessary Project operating expenses" within the meaning of Note B and the other loan documents. The court disagrees. It is true that Skinner was not really a consultant in the traditional sense. Indeed, she was much more than that. Skinner provided a virtually invaluable service to Park Place. Her primary responsibility was the physical plant of the buildings. As a practical matter, however, she was the first responder for any problem. These problems included tenant issues, property repairs, security deposits, signing leases, paying small bills, placing ads to hire workers, and scheduling interviews. Others regularly referred to Skinner as "property manager," and she occasionally signed as such. This characterization reflects her service as a utility player for Underwood.

Treating Skinner as a consultant was a convenient arrangement for both Underwood and her. It did not

prejudice the plaintiff in any way. Skinner, as mentioned, sought to remain as a consultant so that she could pursue consulting work on other matters. For Underwood, Skinner's status as a consultant meant that it would not have to pay her benefits. If Underwood did not contract with her as a consultant, it would have had to hire someone else as an employee and pay benefits, resulting in a greater total cost, as it undoubtedly realized in 2008 when Skinner became an employee. (Scobie, direct; Scobie, 4/8/09, pp. 120–21; Barsky, direct; Witt, cross-examination.) Skinner's total compensation package peaked in 2007, when she received approximately $71,000. This sum is rather modest given the never-ending challenge of managing the facilities in two high-rise apartment buildings containing 451 apartments. The need to have her available on the premises on short notice justified the additional benefit of providing her a rent-free apartment, which Underwood valued at approximately $11,000 per year. (Exs. 217–25, p. 19.) HUD in fact allowed Underwood to provide at least one "Manager's or Superintendent's Rent-Free Unit." (Witt, direct and redirect; Exs. 217–25, p. 19; Ex. 406, pp. 56, 80.) The benefits provided to Skinner were therefore a "reasonable and necessary Project operating [expense]" under Note B and an appropriate reduction of net cash. (Ex. 10, p. 4.) Indeed, Skinner's services were essential to Underwood's desire to maintain its property in the best possible condition and to survive in a competitive housing market.[22]

## 2

### Management Fees

The plaintiff's next claim is that Underwood has "paid and continues to pay [management fees] in excess of $8000 per month to CDC . . . ." (Complaint, ¶ 32.) The history of this claim is important. In April, 1995, prior to the declaration of its second default, Underwood began negotiations with HUD to have it make a second partial payment to Greystone. As part of those negotiations, Underwood proposed to "[a]mend the Project's existing Management Agreement to reduce the management fee from 4% of gross collections to a flat fee of $8000 per month." (Ex. 36, p. 4.)[23] Underwood projected that the savings from this reduction in management fees would "total more than $803,000 over the 13-year term of the proposed Second PPC." (Ex. 36, p. 4.) At the time, Underwood was not paying any "front line expenses," which are overhead expenses of the management company from all its projects, such as the cost of accounting or computer services, that are allocated on a proportional basis to each of its projects. (Scobie, 4/8/09, pp. 38–39; Hubbard direct; Witt, redirect; Grubman, direct.)[24] Underwood's projections of income and expenses did not include any reference to front line expenses. (Scobie, 3/18/09, pp. 87–90; 4/8/09, p. 39; Ex. 36, p. 15.)

Note B incorporated this fixed fee by providing that all "monthly management fees due and payable to the Management Agent shall not exceed the sum of $8,000, unless and until such time as there is sufficient excess Net Cash to pay such additional amount." (Ex. 10, p. 5.)[25] There is no reference to "front line expenses" in Note B.

Underwood began paying its share of CDC's front line expenses in 1999 or 2000. (Scobie, cross-examination; Scobie, 3/18/09, pp. 143–44.) In September, 2000, Underwood wrote HUD that "[i]ncreasing overhead costs now require that we seek HUD's approval to restore the original management fee of four percent (4%) of gross income . . . ." (Ex. 39.) HUD replied in July, 2001, with its observation that "the monthly accounting reports for the past year show a check for $12,200 each month to CDC Management." It then added: "Before we determine if any increase above the $8000 per month is justified, please explain what the $12,200 covers and provide documentation for that amount." (Ex. 43.) In reply, Underwood wrote in August, 2001, that "the additional amounts in question represent reimbursement of 'front-line costs' in accordance with paragraph 6.38 of the HUD Management Agent Handbook . . . . By far, the largest portion of this amount represents the cost of personnel providing property-specific accounting services and pro-rated costs for our central computerized accounting system including hardware, software, and technical support." (Ex. 44.) HUD did not respond or otherwise object to this response, but the defendants admit that HUD never approved Underwood's requested increase in its management fee. (Hubbard, cross-examination; Ex. 1159, p. 3, No. 132.)

Although, as discussed, the defendants challenged the continued applicability of the HUD Handbook at summary judgment, the defendants now urge conformance with "HUD regulations"—a synonym for the Handbook—to explain the payments to CDC that exceeded $8000 per month. (Def. Reply Br., p. 8.) Section 6.37 of HUD Handbook 4381.5, Revision 2, provides: "HUD allows owners to charge certain management costs to the project's operating account. However, other management costs may be paid only out of the management fee." Section 6.38.a (1) states: "Reasonable expenses incurred for front-line management activities may be charged to the project operating account." (Ex. 407, pp. 61–62.)

Notwithstanding the fact that HUD rules thus permit the use of operating revenues to pay for front-line expenses, in the present case the court finds the history of the issue to be controlling. That history reveals that HUD made the second partial payment of claim in 1996 based in part on a representation by Underwood that it would reduce its management fee to $8000 per month. Underwood made no mention of front-line expenses, and it was not paying any at the time. Thus, HUD did

not have an occasion to pass on the issue of front-line expenses. Although, unfortunately, HUD simply did not respond to Underwood's notification in 2001 that it had begun paying front-line expenses, one cannot read its silence as approval when it had previously approved an arrangement that did not include front-line expenses. Hence, HUD has never approved any deviation from or addition to Note B's express language. In view of this history, the court concludes that the use of operating revenues to pay front-line expenses of CDC improperly exceeded the management fee provided for in Note B.

The financial statements clearly reveal these payments. (Exs. 217–25, p. 16, Note 5; Ex. 820, p. 13, Note 5.) The plaintiff's expert, Stewart A. Grubman, correctly calculated them to total $517,400 through 2008. (Ex. 1160.)[26]

### 3

### John Scobie's Compensation

Paragraphs 33 and 34 of the complaint allege that, between 2000 and 2008, Underwood paid Scobie at least $800,000 in salary and benefits that constitute a "[distribution] to [a] general or limited [partner]" prohibited by the terms of the second mortgage and a "payment default under the Loan Documents." (Complaint, ¶¶ 33, 34.) The court substantially agrees with this claim.

Since 1995, Scobie has been general manager of Underwood and a 1 percent limited partner in First Hartford Partners I (First Hartford), which is the general partner of Underwood Towers Limited Partnership. Scobie has, at times, also been identified or identified himself as "chief management officer," "property manager" or "regional property manager." (Scobie, 3/19/09, pp. 22–24; Hubbard, direct; Ex. 243; Ex. 246, p. 1.) Since 1996, Scobie has also been the chief executive officer of CDC, the management agent for Underwood, with a 6 percent ownership interest therein. (Scobie, 3/18/09, pp. 1–20.) According to William N. Hubbard, the managing partner and 36 percent owner of First Hartford as well as president of CDC, Scobie had an "identity of interest" with the Underwood Towers project given that he was also an officer in CDC. (Hubbard, direct.)

Starting in 1995, Scobie began to work half-time at Underwood with a salary of $60,000 or $65,000. (Scobie, 3/18/09, pp. 25, 35.) For a period of time in the early 2000s, Scobie worked on-site for one to two days a week. From the mid-2000s on, Scobie generally worked on-site one day a week. (Scobie direct, cross-examination; Scobie, 3/19/09, p. 21.) A 2007 Park Place employee list identified Scobie as "part-time." (Ex. 297.)

Note 5 in the 2000 annual financial statement provided: "In addition, a partner in First Hartford Partners I is an employee of the Project who provided services in 2000 for approximately $92,000." (Ex. 217, p. 16.) The financial statements for 2001, 2002, and 2003 read

similarly, listing respective salaries of $91,651, $91,800, and $91,606. (Exs. 218–20, p. 16.)

Beginning in August, 2005, Beal and the plaintiff wrote several letters requesting the identity of and further information about this unnamed partner and employee. (Exs. 67, p. 2; 70, p. 2; 82, p. 2, ¶ 11.) Although Hubbard testified that he believed the banks knew the identity of the partner, the defendants did not respond in writing to these inquiries. (Hubbard, direct.) Scobie ultimately admitted in 2009 that these statements refer to him as the undisclosed "partner in First Hartford Partners I" and that he also received some fringe benefits from Underwood in addition to pay. (Scobie, 3/18/09, p. 40; 3/19/09, pp. 25–26.)

From 2004 on, the financial statements no longer included this note; (Hubbard, redirect; Exs. 221–24, p. 16; Ex. 820, p. 13); although Scobie continued to draw salaries from Underwood of approximately $90,000 in 2004 and 2005, and approximately $64,000 in 2006, 2007, and 2008. (Scobie cross-examination; Scobie, 4/8/09, pp. 43–44; Ex. 327, pp. 10, 20, 25; Ex. 1160.) Scobie testified that the deletion of this note was inadvertent. In any event, the annual financial statements also did not disclose that Scobie was both an employee of Underwood and chief executive officer of CDC, receiving a CDC salary ranging from approximately $141,000 in 2000 to $440,000 in 2008, plus benefits. (Scobie, 03/18/09, p. 45; 3/19/09, pp. 27–29; 4/8/09, p. 64, 128; Ex. 331.)[27] Further, Underwood failed to include Scobie's Underwood salary under "Management or Superintendent Salaries" in its 2000–2008 annual financial statements. (Exs. 217–25, p. 19; Ex. 820, p. 16.)[28]

a

Violation of the HUD Handbook

Scobie's salary from Underwood constituted an improper diversion of net cash under three separate theories. The first is that it was a violation of the HUD Handbook. Section 6.38 (a) (3) of the Handbook provides: "The salaries of the agent's supervisory personnel may not be charged to project accounts, with the exception of supervisory staff providing oversight for centralized accounting and computer services for the project." (Ex. 407, p. 65.) Similarly, § 2.9d (1) (c) notes: "Salaries of management agent supervisory staff not assigned to the project must be paid from the management fee. Only full-time, front-line supervisors may be paid from the project account." (Ex. 407, p. 19.) There is little question that Scobie, as chief executive officer of CDC, was one of its supervisory personnel and that he was not primarily involved in providing oversight for centralized accounting and computer services for the project. (Grubman, direct; Witt, direct.)[29] Although there is no evidence that Scobie's CDC salary was charged directly to the project account as opposed to coming from CDC's

management fee, by having Underwood's project account supply funds to pay Scobie a supplemental salary as an Underwood manager—a salary in itself more than that of almost any other Underwood employee, despite the part-time nature of Scobie's work (Witt, direct)—the defendants accomplished indirectly what they could not do directly. Further, Underwood's failure to note in its financial statements from 2004 on that a partner of First Hartford was also an employee of the project (or identify Scobie as the partner in question in the earlier financial statements) and failure to include Scobie's salary under "Management or Superintendent Salaries" in its 2000–2008 annual financial statements collectively suggest an attempt to conceal an improper charge to operations. (Grubman, direct; Exs. 217–24, p. 19.) In short, the defendants circumvented the HUD prohibition on supervisors of the management agency receiving part or all of their salary from project revenues. See *In re Tobacco Row Phase IA Development, L.P.*, 338 B.R. 684, 691 (Bankr. E.D. Va. 2005) ("[t]he court does not consider the salary, even a portion of the salary, of a supervisor with oversight of many projects along the East Coast to constitute 'operating and maintenance expenses' of debtor").

b

Improper Distribution to a Partner
Under the Second Mortgage

The second basis for finding the salary Underwood paid to Scobie improper is the second mortgage itself. The rider to the original second mortgage provides: "Mortgagor hereby agrees not to make any distributions to its general or limited partners until (i) this Second Mortgage has been recast as set forth in the Second Mortgage Note and is fully amortizing and (ii) the First Mortgage is fully amortizing." (Ex. 6, § 26.)

Although the meaning of the amortization conditions is unclear, there seems to be no dispute that the defendants have not satisfied them. (Witt, direct.) Thus, the question posed is whether the salary paid by Underwood to Scobie is a "[distribution] to [a] general or limited [partner]."[30] With regard to the threshold question of whether Scobie's salary was a "distribution," the HUD Inspector General has stated: "Under HUD guidelines, owner salaries other than approved management fees are considered distributions that can only be paid out of surplus cash." (Ex., 484, pp. 3–4.)[31] Thus, assuming Scobie was an owner, his salary would constitute a distribution.

The more difficult issue is whether Scobie was a "general or limited partner" of the mortgagor within the meaning of the second mortgage. To be sure, as a technical matter, Scobie was not a direct partner or owner of Underwood but, instead, was a limited partner of Underwood's general partner. The court does not

wish to disregard lightly the importance and legitimacy of corporate form. On the other hand, even the defendants' expert, Jeffrey Barsky, conceded that, in substance, Scobie was a minority owner of Underwood. (Barsky, cross-examination.) Grubman concurred. (Grubman, cross-examination.) As noted, Hubbard testified that Scobie had an "identity of interest" with the Underwood Towers project given that he was also an officer in CDC. The court credits all of this testimony and concludes that, for purposes of interpreting the second mortgage, Scobie was a general or limited partner of Underwood and that his salary was an improper distribution.

c

### The Salary Was Not a Reasonable and Necessary Operating Expense

As discussed, both Note B and the regulatory agreement require that the defendants use project revenues only for reasonable and necessary expenses.[32] From 2000 to 2005, Scobie received $90,000 per year to work one or two days a week at Park Place. From 2006 to 2008, Scobie received approximately $65,000 per year for similar part-time work. During this same time period, Scobie received six-figure salaries of up to $440,000 from CDC. While the court does not question the quality of Scobie's work, for a project that was struggling to make mortgage payments to its lender, Scobie's additional $65,000 to $90,000 salary from Underwood for part-time work goes outside the boundaries of a reasonable and necessary expense. As mentioned, the history of the defendants' failure to disclose completely Scobie's identity as the recipient of this salary suggests a consciousness of this impropriety. For these reasons, the court concludes that the salaries paid to Scobie constitute a violation of the loan documents and an additional basis for default.

The total of Scobie's unauthorized annual salaries, including benefits, from 2000 to 2008 is $805,663. (Ex. 1160.)[33]

4

### Nicholas Carbone's Apartment

The next basis for default alleged in the Complaint concerns Nicholas Carbone's apartment. (Complaint, ¶ 36.) Carbone was a limited partner in Underwood. (Carbone, 12/22/08, p. 18.) In the late 1980s, Carbone entered into an arrangement with Hubbard whereby Carbone, for several years, made available to Underwood, while its garage underwent construction, an adjacent parking lot owned by the Capitol Assets Associates, of which Carbone was a principal owner. In exchange, Hubbard offered Carbone a rent-free apartment until he was seventy-five years old. (Hubbard, direct; Scobie, 4/8/09, pp. 66–67; Carbone, 12/22/08, pp. 23–39, 84–85; Ex. 357A, p. 284; Ex. 1159, p. 6, No. 17.)[34]

Carbone moved into Park Place in 1993. (Scobie, 4/8/09, p. 72.) From 2000 to 2004, Carbone lived in an apartment that normally rented for $8700 per year (or $725 per month). In 2005, Carbone moved to a penthouse unit on the twenty-third floor that normally rented for $13,800 per year (or $1150 per month) and remained there throughout the trial period. (Scobie, cross-examination; Ex. 274.) Carbone paid no rent through 2004. He testified at his deposition, which was admitted as a trial exhibit, that he paid the rent differential, which would have been $425 per month, after he moved. However, Scobie, Underwood's general manager, reported that Carbone did not make these payments. (Carbone, 12/22/08, pp. 42–43; Scobie, 4/22/09, p. 57.)

Indeed, the evidence reveals that, not until February, 2008, did the defendants collect any rent from Carbone. At that time, CDC began paying Carbone $1000 per month for consulting, which Carbone turned over to the project along with $150 of his own funds, for a total of $1150 monthly. (Ex. 357A, p. 282; Ex. 780; Scobie direct; Scobie, 3/19/09, p. 20; Witt, direct.) The defendants do not dispute that, prior to that time, they did not disclose Carbone's essentially rent-free apartment to their auditors, to HUD, or to any other lender.[35]

The plaintiff initially asserts that the arrangement constituted an improper distribution to a partner. In that regard, the plaintiff again relies on paragraph 26 in the rider to the original second mortgage which, as discussed, provides: "Mortgagor hereby agrees not to make any distributions to its general or limited partners until (i) this Second Mortgage has been recast as set forth in the Second Mortgage Note and is fully amortizing, and (ii) the First Mortgage is fully amortizing." (Ex. 6, para. 26.) The plaintiff has established the components of this prohibition. Under the HUD Handbook, a "distribution" is "any withdrawal or taking of cash or any assets of the project other than for the payment of reasonable expenses necessary to the operation and maintenance of the project." (Ex. 406, p. 17.)[36] The receipt of a rent-free apartment would certainly qualify as the taking of an "[asset] of the project." (Grubman, direct.) Next, it is undisputed that Carbone is a limited partner of Underwood. Finally, as stated, although the meaning of the two conditions stated in subparagraphs (i) and (ii) is not completely clear, there seems to be no dispute that the mortgages are not fully amortizing and that the defendants have not satisfied these conditions. Thus, the court agrees that the rent-free apartment provided to Carbone represents a prohibited distribution.

The plaintiff also contends that Carbone's arrangement artificially reduced rent revenues and thereby deprived it of net cash. The defendants' first response is that the plaintiff received a benefit in the form of a

free parking lot valued at well over $100,000 and that that benefit exceeds the nine year loss of rent revenues, which the plaintiff's damage calculations reveal to be $98,700. (Carbone, 12/22/08, pp. 27–28; Ex. 390; Scobie, direct.)[37] The evidence also reveals that Carbone provided other cost-free services to Underwood such as contacting the city of Hartford, HUD, and our congressional delegation, with whom he had contacts, concerning the development of the project and the restructuring of its debt. (Carbone, 12/22/08, pp. 73–81; Ex. 357A, pp. 289–90.)

The initial difficulty with this argument is that neither the plaintiff nor any other lender or auditor ever knew about the Hubbard-Carbone deal or sanctioned it. (Scobie, 4/8/09, pp. 74, 76–77.) Had HUD or the plaintiff known about the arrangement, it might not have approved it. The lender might well have found that the value of the rent-free apartment over approximately twenty years greatly exceeded the value of the temporary use of the parking lot for several years in the late 1980s or early 1990s. Indeed, the fact that, after this issue came to light in 2008, CDC attempted to provide Carbone a rent check for $1000 per month in exchange for "consulting" suggests that the defendants did not seriously believe that Carbone's loan of his parking lot was still sufficient consideration for his rent-free apartment. Nor is there any evidence of what consulting work Carbone was actually doing in 2008. Had the lenders known about these arrangements they might also have found that an inside deal with a limited partner created bad optics and set the wrong example for the other tenants in an urban high-rise. Even Scobie admitted that the consideration given to Carbone prior to the time he paid market rent for the apartment was not a reasonable and necessary operating expense of the project. (Scobie, Ex. 357A, p. 368.)

The defendants' other response is that the plaintiff cannot prove damages without showing that it would have rented Carbone's apartment to someone else at full value. While it is true that there were usually vacancies at Park Place, it is also true that the project had 451 apartments and an annual turnover rate of almost 50 percent. Thus, tenants were always moving in and out at Park Place. Moreover, the fact that there were vacancies in a 451-apartment project with a variety of apartment types does not establish that there was no demand for the specific type of two-bedroom apartment that Carbone occupied. Further, on the whole, occupancy was high, generally above 90 percent, particularly in the early years of the trial period. (Exs. 123–204, line 9; Scobie, direct; Scobie, 3/18/09, p. 78.) Thus, it is more likely than not that the plaintiff would have leased Carbone's apartment to someone who actually paid rent and contributed to the project's revenues. Under these circumstances, the Carbone arrangement resulted in a loss of net cash to the plaintiff in addition to represent-

ing a breach of the loan documents. The plaintiff is therefore entitled to damages of $97,050 on this claim, as calculated in footnote 37 of this opinion.[38]

## 5

### Capital Assets

The plaintiff next claims that the defendants improperly used $3,470,857 in operating revenues—which came mostly from rents—to pay for capital or fixed assets such as a new roof, new windows, or major repairs. (Complaint, ¶ 41; Ex. 1160.)[39] Analysis of this claim begins with definitions. The HUD handbook defines "Expenditure" as "[a]n outflow of assets or increase in liability in connection with the acquisition of assets or expenses; includes both expenses and purchases of fixed assets." An "Expense," in turn, is "[t]he outflow of assets or increases in liabilities that takes place in connection with the products or services provided during an accounting period." "Expensed" means "[t]he process of having charged an expenditure against operations, such expenditure having been considered to benefit a current accounting period (as opposed to a future accounting period). It is the opposite of 'capitalizing' an expenditure." (Ex. 406, p. 45.) The Handbook defines "Capitalize" as, "[t]o set up an expenditure as an asset or to increase the recorded value of an asset so that the expenditure can be charged off as depreciation expense during future accounting periods. It is the opposite of 'expensing' an expenditure." (Ex. 406, p. 43.) In other words, as explained by Grubman, an expenditure can be either "expensed," particularly if it benefits the current accounting period, or "capitalized," particularly if it benefits future accounting periods. As noted, if expenditures are capitalized, they appear as additions to fixed assets in Underwood's financial statements. (Scobie, 3/18/09, p. 141.)

Note B does not directly address the issue of whether a project can use its operating revenues to fund capital improvements. However, as explained previously, Note B does provide that "Net Cash" is calculated by subtracting various expenses, such as PILOT payments, from "Net Operating Income." "Net Operating Income," in turn, means the difference between gross revenue and "the operating and maintenance *expenses* of the Project." (Emphasis added.) (Ex. 10, p. 2.) The plaintiff relies initially on the presence of the term "expenses" to argue, in accordance with the HUD Handbook definitions, that items that can be "expensed" can properly form part of "net operating and maintenance expenses" but that capital "expenditures," which are capitalized but not "expensed," are not part of "net operating and maintenance expenses."[40]

This approach is overly formalistic. The evidence established that lawyers rather than accountants drafted Note B (Barsky, cross-examination.) It is

unlikely that the drafter or drafters contemplated the technical, accounting distinction between "expense" and "expenditure." Indeed, Underwood's accountant for several years, Arthur Adams, testified that he uses the plain language definition of "expense" to mean "expenditures" or "use of cash" and that the term "operating expenses" encompasses both expenses and capital items. (Adams, 6/26/08, pp. 183–88, 193–98.) The defendants' expert, Barsky, testified credibly that the language of Note B was unfortunate but that it clearly did not foreclose using operating revenues to make expenditures for capital projects. (Barsky, cross-examination.)

The plaintiff does not challenge any of the defendants' decisions as to whether to expense or capitalize any expenditure in this case. Generally, the defendants capitalized expenditures costing more than $500,000. (Scobie, recross.) Instead, the plaintiff contests the defendants' use of operating revenues to pay for capital expenditures. The plaintiff claims that, at the time of the 1995 PPC, the defendants "bargained away" their right to use operating funds for capital projects and, going forward, should have exhausted the funds in the replacement reserve fund before considering the use of operating revenues.

Scobie testified clearly that, at the time of the second PPC, Underwood was using operating revenues to fund capital improvements. (Scobie, direct.) However, the defendants' application letter for a second PPC, written in 1995, simply does not address the issue of how to fund capital expenditures. The defendants did attach to the letter a graph containing a thirteen year operating projection in which the defendants predicted that they would deposit $45,100 per year (or $1000 per unit) into the replacement reserve account. Ultimately, at HUD's request, Underwood deposited $12,300 per month, or approximately $148,000 per year into the reserve account. (Scobie, 3/18/09, p. 139; 4/9/09, pp. 5-7; Ex. 36, p. 11; Ex. 38, p. 1.) Subsequently, the defendants' financial statements fully revealed that they were using operating revenues to fund capital improvements. (Grubman, cross-examination.) HUD never objected to the defendants' decisions to use operating revenues for these purposes. (Scobie, direct.)[41]

In March, 2003, Underwood's decision to use operating revenues and net cash to pay for capital expenditures above the amount in the reserve replacement account did come under question from PAMI. (Scobie, 4/8/09, pp. 136–37; Ex. 45.) Underwood replied to PAMI in April, 2003, that HUD's practice was that "project funds must be used first to maintain the project to ensure the health and safety of the residents prior to payment of any subordinate debt." Underwood also reminded PAMI that, while HUD held the notes, HUD never objected to expenditures of operating revenues for capital improve-

ments. (Ex. 46, p. 3.) PAMI wrote the defendants in May, 2003, that it would accept their payments "without prejudice to any and all of our rights under the applicable loan documents," but PAMI did not specifically refer to the defendants' April letter or to the issue of capital expenditures. (Ex. 47.)

Based on this history, the plaintiff advances the theory that Underwood "bargained away" its right to use operating revenues for capital expenditures in the 1995 PPC. (Grubman, direct.) The court disagrees. In fact, as noted previously, the PPC is silent on this precise issue. Although PAMI questioned the defendants' policy, the use of operating revenues for capital improvements was essentially an established practice from the time of the second PPC. Because the defendants were transparent about this practice, HUD was undoubtedly aware of it and did not question or prohibit it. If anything, this record reveals HUD's tacit acceptance of the defendants' policy. It certainly does not demonstrate that the defendants entered into an agreement that ceded or otherwise bargained away their right to use operating revenues for capital expenditures.

The HUD Handbook provides that "[t]he Reserve Fund for Replacements will not always be adequate to meet the future capital needs of a project nor is it expected to do so. There are other sources of capital available to projects." The handbook then lists as examples of funding sources some thirteen items such as "Owner Contributions in the form of equity," "Energy loans," and "Loans or grants from other governmental agencies or private foundations." The last item listed is "Cash flows from operations." (Ex. 405, p. 52.) Thus, as noted by the defendants, HUD rules explicitly authorize the use of operating revenue as a permissible source of funding for capital improvements. (Def. Reply Br., p. 8.)

Underwood had a strong need to do capital repairs. Underwood had an obligation under its lease from Hartford to "maintain a high quality urban environment." (Ex. 601, p. 20.) HUD required the owners to "maintain [the project] in good physical and financial condition," and to "[assure] safe, sanitary, and decent housing for those the housing was constructed to serve." (Ex. 405, pp. 15, 16.) The project also existed in a very competitive market for large apartment complexes and thus had to maintain its quality and reputation. (Scobie, direct.)

Underwood did use approximately $1.75 million over eight years from the reserve replacement account (Ex. 1160.)[42] It also spent an additional $3.47 million of operating project revenues. (Ex. 1160.) Given that the plaintiff does not challenge the defendants' decisions to spend for capital assets, the fact that Underwood spent the additional $3.47 million establishes that Underwood had valid capital needs that exceeded the funds that it felt it could safely remove from the reserve

replacement account. Although the defendants had $846,213 remaining in the reserve account at the end of 2007, presumably this money would fund future capital needs, which might grow as the project ages. (Ex. 824.) Given the long history of Underwood using operating revenues with HUD's acquiescence, along with the fact that the HUD handbook expressly permitted their use, the court concludes that it was permissible and appropriate to use operating revenues to pay for these additional capital needs.[43]

6

Legal Fees

The final category of alleged misuse of project rents concerns legal fees paid to lawyers for the defendants to defend this foreclosure and damages action and to file suit against the plaintiff. (Complaint, ¶¶ 42–45.) The plaintiff filed the complaint in the present case on December 22, 2006. As stated previously, on May 30, 2006, some seven months earlier, Underwood filed a three count complaint in Hartford Superior Court against Beal and the other lienholders. *Underwood Towers Ltd. Partnership* v. *Beal Bank*, supra, Superior Court, Docket No. CV-06-5004189-S. Count one of this complaint sought a declaratory judgment concerning Underwood's reporting obligations and the basis of its alleged defaults.[44] Count two alleged a breach of contract and of the implied covenant of good faith and fair dealing by Beal. Count three charged Beal with violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., and alleged, among other things, that "Beal has systematically sought to artificially create a pretext to . . . extort funds from the plaintiff . . . ." (Id., Complaint, ¶ 13.) Underwood sought compensatory and punitive damages.

The evidence established that the defendants used $254,302 in project funds to pay two law firms—Weinstein & Wisser, P.C., in Hartford and Nixon Peabody, LLP, in New York—to defend and prosecute these two lawsuits (Ex. 384.) The question presented is whether the use of project funds was proper for these purposes.

The use of project revenues to defend a foreclosure action is straightforward. Section 10-17 of HUD Handbook Number 4350.1, Revision 1, provides: "USE OF PROJECT FUNDS. An owner may not use project funds to pay an attorney, agents, or representatives to develop a workout proposal for HUD to consider and/or to advocate that HUD approve the plan. Further, project funds may not be used to defend a foreclosure action or to pay for a bankruptcy action." (Ex. 405, p. 68.) Thus, the HUD Handbook specifically prohibits the use of project funds to pay legal fees to defend a foreclosure action.[45]

Whether the use of project rents to pay for a declara-

tory judgment and damages action against the lender constitutes a default is not as straightforward because the HUD Handbook does not specifically address such a possibility. However, a chart of accounts in the Handbook does define "Legal Expense" as "legal fees or services incurred on behalf of the project (as distinguished from the mortgagor entity). For example, agents charge legal fees for eviction procedures to this account." (Ex. 406, pp. 52, 80.) Under this definition, the defendants' declaratory judgment and damages action would not qualify as a proper expense because its primary purpose was to benefit the mortgagor rather than the project itself.

On August 14, 2007, the court, *Langenbach, J.*, found that the legal fees "are not necessary operating expenses" and granted an injunction—albeit a temporary one—prohibiting the defendants from using project funds to pay them. (Ex. 817.)[46] Several courts, while not addressing the unique type of lawsuit filed by the defendants here, have condemned the use of project funds for litigation that does not benefit the project, even without reliance on the HUD handbook. See *United States* v. *Frank*, 587 F.2d 924, 927 (8th Cir. 1978) (District Court properly determined that use of project funds by borrower for lawsuit to enjoin foreclosure was "not incidental to the operation or maintenance of the project but [was] related to the personal investment interests of the mortgagor partnerships"); *United States* v. *Berk & Berk*, 767 F. Supp. 593, 598 (D.N.J. 1991) (use of project funds for legal expenses to litigate foreclosure action constituted improper use of project funds "for the benefit of the owner, not the project, in violation of the regulatory agreement"); *United States* v. *West Street Associates Ltd. Partnership*, No. CIV.A.3:96-CV-01864, 1998 WL 34193430, *4 (D. Conn. July 20, 1998) (use of project funds for legal fees improper because they were not expended to "collect rent, evict tenants, or defend lawsuits growing out of the operation of the project" (internal quotation marks omitted)). Although the defendants attempt to distinguish these cases on the ground that the United States—and essentially HUD—was the mortgagee, the reasoning of the cases extends fully to the present case. As a logical matter, it would seem almost self-evident that a borrower should not use rental funds that ultimately belong to the lender to file suit against the same lender for compensatory and punitive damages. Indeed, no reasonable business would consent to financing a lawsuit against itself. For all these reasons, the defendants' use of $254,302 in project assets to pay for legal fees constituted an improper use of those assets and a mortgage default.

C

Conditions Precedent

The third element of a foreclosure case is whether

the mortgagee has satisfied any conditions precedent. See *GMAC Mortgage, LLC* v. *Ford*, supra, 144 Conn. App. 176. In this case, there are none that apply. Neither the second mortgage nor Note B requires a formal notice of default or opportunity to cure prior to initiation of a foreclosure action. (Ex. 6, p. 3, ¶ 16; Ex. 10, ¶ E.) Indeed, the second mortgage expressly states that "in the event of default . . . at the option of said Grantee, without notice or demand, suit at law or in equity, may be prosecuted as if all moneys secured hereby had matured prior to its institution." (Ex. 6, p. 3, ¶ 16.)[47] Although, as discussed earlier and noted below, the plaintiff did provide Underwood notice of default and possible foreclosure, in the absence of any requirement to do so the plaintiff is not precluded from pursuing foreclosure based on defaults not identified in those notices. Nor, as discussed in the introduction to part IV B of this opinion, is there any time limitation as to when the default must have occurred. In short, the plaintiff has satisfied the third element of a prima facie foreclosure case.

## D

### Special Defenses

The defendants have alleged numerous special defenses to the foreclosure count. "Historically, defenses to a foreclosure action have been limited to payment, discharge, release or satisfaction . . . or, if there had never been a valid lien. . . . The purpose of a special defense is to plead facts that are consistent with the allegations of the complaint but demonstrate, nonetheless, that the plaintiff has no cause of action. . . . A valid special defense at law to a foreclosure proceeding must be legally sufficient and address the making, validity or enforcement of the mortgage, the note or both. . . . Where the plaintiff's conduct is inequitable, a court may withhold foreclosure on equitable considerations and principles. . . . [O]ur courts have permitted several equitable defenses to a foreclosure action. [I]f the mortgagor is prevented by accident, mistake or fraud, from fulfilling a condition of the mortgage, foreclosure cannot be had . . . . Other equitable defenses that our Supreme Court has recognized in foreclosure actions include unconscionability . . . abandonment of security . . . and usury." (Internal quotation marks omitted.) *Fidelity Bank* v. *Krenisky*, 72 Conn. App. 700, 705–706, 807 A.2d 968, cert. denied, 262 Conn. 915, 811 A.2d 1291 (2002).

The court has already addressed, both in this opinion and in the court's summary judgment decision, many of the special defenses to the foreclosure count, such as those defenses dealing with the lost note, the applicability of the HUD handbook and regulatory agreement, and the issues of waiver and estoppel. (Entry #662.00, pp. 8–12.) The only other special defense to foreclosure that the defendants mention in their brief is one alleging

that the plaintiff failed to mitigate its damages by exercising its rights to a receivership to collect rents. However, the defendants' brief provides no legal analysis, only three sentences of argument, and does not even cite the clause in the second mortgage authorizing the appointment of a receiver. (Def. Br., p. 47; Ex. 6, p. 2, ¶ 5.) Under these circumstances, the court considers the argument abandoned due to inadequate briefing. See *Raynor* v. *Commissioner of Correction*, 117 Conn. App. 788, 796–97, 981 A.2d 517 (2009) ("[R]eviewing courts are not required to review issues that have been improperly presented to th[e] court through an inadequate brief. . . . These same principles apply to claims raised in the trial court." (Emphasis omitted; internal quotation marks omitted.)), cert. denied, 294 Conn. 926, 986 A.2d 1053 (2010). In any event, for the reasons discussed subsequently in weighing the equities, the plaintiff's decision not to invoke a receivership does not rise to the level of unconscionability or otherwise represent a valid special defense.

### E

### Foreclosure Conclusion

The plaintiff correctly recognizes that foreclosure is an equitable action and that the court "exercises discretion in ensuring that justice [is] done." (Internal quotation marks omitted.) *National City Real Estate Services*, *LLC* v. *Tuttle*, 155 Conn. App. 290, 295, 109 A.3d 932 (2015). The defendants present valid arguments that they have run Park Place since its inception without serious criticism from HUD. They also have a difficult task in maintaining an aging, urban high-rise apartment complex as a safe and decent housing environment for all.

On the other hand, the defendants have had their chances to avoid foreclosure. They defaulted twice in the 1990s. HUD's two partial payments of the claim prevented foreclosure on those occasions. The defendants first received notice of default from the plaintiff in March, 2006. The plaintiff agreed to a "no litigation" period through May 30, 2006. (Ex. 83.) The defendants responded in part at the end of that period by suing the plaintiff for compensatory and punitive damages. The defendants have not reduced the principal on Note B at all and have not made any payments of any kind to Beal or the plaintiff on Note A. (Ex. 1159, p. 5, ¶¶ 155, 156.) The court has now found that the defendants diverted a total of $1,674,415 in net cash from the plaintiff and its predecessors.[48] Under these circumstances, the court has no difficulty in concluding that the plaintiff is entitled to foreclosure.

The parties have stipulated, based on a December 14, 2018 appraisal, that the value of the property is $30,550,000. (Ex. 1155.) The debt, as noted previously, totaled over $102,100,000 as of December, 2018. Subject

to a presentation by either party of evidence of a radical change in these numbers, the court orders the entry of a judgment of strict foreclosure in favor of the plaintiff. The court will set law days after conferring with the parties.

V

## COUNTS TWO THROUGH TEN

The plaintiff seeks $5,350,564 in compensatory damages, plus other enhanced damages and costs, in addition to its recovery in the foreclosure count.[49] In its summary judgment ruling, the court set out the reasoning and authority supporting the plaintiff's right to sue under the mortgage contract (but not Note B) for damages in addition to seeking foreclosure. (Entry #662, pp. 15–24.) The court will summarize that discussion here.

Of primary importance is the language of the second mortgage document. This document not only conveys a property interest from the borrower to the lender, as would a simple residential mortgage, but it also contains various covenants, or contractual promises, made by Underwood to the plaintiff. See *Emigrant Mortgage Co.* v. *D'Agostino*, 94 Conn. App. 793, 799, 896 A.2d 814 ("[c]onstruction of a mortgage deed is governed by the same rules of interpretation that apply to written instruments or contracts generally, and to deeds particularly" (internal quotation marks omitted)), cert. denied, 278 Conn. 919, 901 A.2d 43 (2006). Paragraph four of the second mortgage provides that "the Grantor [Underwood] . . . does hereby covenant and agree as follows . . . 4. [t]hat all rents, profits and income from the property covered by this Mortgage are hereby assigned to the Grantee for the purpose of discharging the debt hereby secured. Permission is hereby given to Grantor so long as no default exists hereunder, to collect such rents, profits and income for use in accordance with the provisions of the Regulatory Agreement . . . ." (Ex. 6, p. 2, ¶ 4.)[50] Paragraph sixteen then provides: "That in the event of default in making any monthly payment provided for herein or in the Note secured hereby . . . suit at law or in equity, may be prosecuted . . . ." (Ex. 6, p. 3, ¶ 16.) Thus, the language of the mortgage creates an obligation or duty of Underwood to the plaintiff that the plaintiff may enforce by an action in equity or at law. Count one of the complaint, alleging foreclosure, represents a suit in equity. Counts two through ten constitute actions in law.

Wholly apart from paragraph sixteen of the mortgage, there is ample case law supporting the proposition that a mortgagee may sue a mortgagor for damages for violation of a covenant or provision in the mortgage. See *First Connecticut Small Business Investment Co.* v. *Shillea*, Superior Court, judicial district of Fairfield, Docket No. CV 85-0222250-S (February 20, 1991) (3 Conn. L. Rptr. 295, 296) (In a lawsuit by a lender against

a borrower for breach of a covenant in a mortgage deed warranting against encumbrances, the court stated that "[i]t is clear that any action for damages on the debt or note is barred by the [prior] foreclosure [pursuant to General Statutes § 49-1]. However, there is nothing in the language of the statute nor in the cases to indicate a bar for damages for breach of the covenant against encumbrances in the deed itself . . . .");[51] *Brayton* v. *Pappas*, 52 App. Div. 2d 187, 189, 383 N.Y.S.2d 723 (1976) ([a]lthough plaintiff mortgagee could not foreclose because it improperly accelerated debt, "[i]f [the] defendants . . . demolished the four-room residence on the property and did not first obtain permission to do so, they were in breach of an express condition of the mortgage agreement and [the] plaintiff should be entitled to damages, if any, as a consequence of their diminution of his security"). Although a possible obstacle to enforcement of a mortgage contractual provision is a nonrecourse or exculpatory clause, such as the one in Note B here, various courts have held that a mortgagee may proceed with an action for money damages based on a debtor's failure to pay rents, despite the existence of a nonrecourse clause in the loan documents. See *Federal Home Loan Mortgage Corp.* v. *Dutch Lane Associates*, 775 F. Supp. 133, 140 n.4 (S.D.N.Y. 1991) ("[t]he [nonrecourse] provision does not bar recovery of rents from defendants [because] . . . it is inapplicable to the [d]efendants' absolute and independent assignment of rents obligations"); *7800 W. Outer Road Holdings*, *L.L.C.* v. *College Park Partners*, *L.L.C.*, Docket No. 303182, 2012 WL 2402010, *1 (Mich. App. June 26, 2012) ("[w]hile the lender may not attempt to collect a deficiency, the lender may enforce additional security agreements, such [as] an assignment of rents"), appeal denied, 493 Mich. 967, 829 N.W.2d 218 (2013); *International Business Machines Corp.* v. *Axinn*, 290 N.J. Super. 564, 568, 676 A.2d 552 (App. Div. 1996). ("[w]e also think it plain that entry of judgment against [the defendant] for rents collected by him but to which [the mortgagee] was entitled does not constitute a deficiency judgment in violation of the [nonrecourse] provision of the promissory note").

It is true, in the present case, that the damages sought by the plaintiff, which essentially constitute net cash payments that the defendants failed to make, represent part of the principal and interest that the plaintiff would recover if it were to obtain a deficiency judgment. For this reason, the defendants argue that the plaintiff is "striving to convert what are nonrecourse loans into recourse loans . . . ." (Def. Br., p. 43.) However, the plaintiff is not relying on the mere fact that the defendants owe principal plus interest as provided in the note, as it would in a deficiency proceeding. Rather, the plaintiff relies on a separate provision in a separate document—the covenants in the second mortgage concerning rental income—and must assume the higher

burden of proving the contract and tort causes of action it has pleaded. Further, the plaintiff's claim of $5,350,564 in damages is far less than the probable deficiency here of approximately $70 million. A final distinction is that several counts seek damages from CDC, which would not be possible in a deficiency proceeding. Thus, the damages counts rest on their own sound and independent reasoning and authority.

The court granted summary judgment to the defendants on counts six and eight, which were based solely on Note B. (Entry # 662.00, p. 19.) The remaining counts allege the following causes of action:

Count Two: Breach of Contract (as to Underwood only).

Count Three: Breach of Covenant of Good Faith and Fair Dealing (as to Underwood only).

Count Four: Conversion (as to Underwood only).

Count Five: Civil Theft (General Statutes § 52-564) (as to Underwood only).

Count Seven: Unjust Enrichment (as to CDC only).

Count Nine: Fraud (as to both defendants).

Count Ten: CUTPA (as to both defendants).

The court will now discuss each of these remaining counts.[52]

A

Count Two: Breach of Contract

In count two, the plaintiff seeks $5,350,564 in damages for breach of contract by Underwood. This count focuses on paragraph four of the second mortgage, which, as noted, provides that "the Grantor [Underwood] . . . does hereby covenant and agree as follows . . . 4. [t]hat all rents, profits and income from the property covered by this Mortgage are hereby assigned to the Grantee for the purpose of discharging the debt hereby secured. Permission is hereby given to Grantor so long as no default exists hereunder, to collect such rents, profits and income for use in accordance with the provisions of the Regulatory Agreement." (Ex. 6, p. 2, ¶ 4.) The regulatory agreement, in turn, states: "Owners shall not without the prior written approval of the Secretary . . . [a]ssign, transfer, dispose of, or encumber any personal property of the project including rents, or pay out any funds except from surplus cash, except for reasonable operating expenses and necessary repairs . . . ." (Ex. 1, p. 2, ¶ 6 (b).) The court concludes that Underwood breached these provisions by failing to turn over rental income that the defendants expended for matters other than reasonable and necessary expenses. These matters consisted of front-line CDC expenses, Scobie's salary from Underwood, and legal fees for defending and prosecut-

ing the pending cases.

The claimed amount of $5,350,564 includes moneys diverted for Skinner's bonus and expenditures for capital projects. The court has concluded that these expenditures, to the extent they affected rental income, were reasonable and necessary. Deducting these expenditures, along with the losses related to Carbone's apartment, which the court discusses in the next section, the damages proven on count two amount to $1,669,007.

B

### Count Three: Breach of Covenant of Good Faith and Fair Dealing

Under our law, "every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement. . . . The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term. . . . To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." (Emphasis omitted; internal quotation marks omitted.) *Landry* v. *Spitz*, 102 Conn. App. 34, 42, 925 A.2d 334 (2007). "[T]he notion of bad faith encompasses a wide range of dishonest behavior, including evasion of the spirit of the bargain. [W]hen one party performs the contract in a manner that is unfaithful to the purpose of the contract and the justified expectations of the other party are thus denied, there is a breach of the covenant of good faith and fair dealing, and hence, a breach of contract, for which damages may be recovered . . . ." (Internal quotation marks omitted.) Id., 44–45.

The court recognizes the defendants' objection that the right of action for breach of the implied covenant of good faith and fair dealing is not just an additional basis for contract liability when a party acted in bad faith. (Def. Reply Br., p. 17.) Nevertheless, the free apartment given to Carbone fits well within the core of this cause of action. Although the Carbone transaction might not technically qualify as a breach of paragraph four of the second mortgage because it did not involve an affirmative misuse of rental income, it most certainly did "injure the right of the other to receive the benefits of the agreement." (Internal quotation marks omitted.) Id., 42. Providing a free apartment to Carbone resulted in a loss of rental income to the project, which was a benefit for which the plaintiff had bargained. Further, the defendants' concealment of this deal from everyone—including their own accountant—along with their rather transparent effort to justify the deal by paying

for "consulting" services that the defendants did not identify—all evinces bad faith. Accordingly, the court awards the plaintiff $97,050 in damages from Underwood on count three. See footnote 37 of this opinion.

## C

### Count Four: Conversion

Generally, "[c]onversion is an unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights." (Internal quotation marks omitted.) *Miller* v. *Guimaraes*, 78 Conn. App. 760, 778, 829 A.2d 422 (2003). As the defendants point out, "[a]n action for conversion of funds may not be maintained to satisfy a mere obligation to pay money. . . . It must be shown that the money claimed, or its equivalent, at all times belonged to the plaintiff and that the defendant converted it to his own use." (Internal quotation marks omitted.) *Deming* v. *Nationwide Mutual Ins. Co.*, 279 Conn. 745, 772, 905 A.2d 623 (2006). Thus, "[t]he requirement that the money be identified as a specific chattel does not permit as a subject of conversion an indebtedness which may be discharged by the payment of money generally. . . . A mere obligation to pay money may not be enforced by a conversion action . . . and an action in tort is inappropriate where the basis of the suit is a contract, either express or implied." (Internal quotation marks omitted.) Id.

Although the defendants may have permissibly intermingled rental income, including net cash, in their operating account with other moneys to which the plaintiff did not have a right, the language of paragraph four of the second mortgage makes clear that rental income was at all times the property of the plaintiff and essentially held in trust by the defendants.[53] Rental income and net cash were not just assets that might satisfy a general obligation to pay money. The defendants cannot claim immunity from conversion because they chose to intermingle rental income belonging to the plaintiff with other funds belonging to them. The evidence establishes that Underwood took rental income that, according to paragraph four, was the property of the plaintiff and failed to pay it over to the plaintiff as part of Underwood's obligation to make monthly payments of net cash. Based on this evidence, the plaintiff has proven a case of conversion.

In a passing sentence, the defendants suggest that the economic loss doctrine constitutes a special defense that bars the plaintiff's "tort claims," including, apparently, conversion. (Def. Br., p. 46.) Correctly stated, the economic loss doctrine bars "*negligence* claims for commercial losses arising out of the defective performance of contracts . . . ." (Emphasis added; internal quotation marks omitted.) *Ulbrich* v. *Groth*, 310 Conn.

375, 390 n.14, 78 A.3d 76 (2013). The economic loss doctrine does not bar all tort claims or, for that matter, CUTPA claims. Id., 408–13. Indeed, application of the economic loss doctrine would eliminate the tort of conversion, since the heart of conversion is, in fact, economic loss. The court rejects the defendants' theory.

The plaintiff seeks conversion damages of $1,592,554 from the time it acquired the loan in 2006. From that amount, the court must deduct $951,929, which is the claim of damages for improper capital expenditures from 2006 to 2008, with which the court disagrees. (Pl. Br., p. 48; Ex. 1160.)[54] The net damages for this count is $685,758.

D

Count Five: Statutory Theft

The fifth count alleges statutory theft. "[S]tatutory theft under . . . § 52-564 is synonymous with larceny [as provided in] General Statutes § 53a-119. . . . Pursuant to § 53a-119, [a] person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or [withholds] such property from [the] owner." (Internal quotation marks omitted.) *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.*, 255 Conn. 20, 44, 761 A.2d 1268 (2000). "[S]tatutory theft requires a plaintiff to prove the additional element of intent over and above what he or she must demonstrate to prove conversion." (Internal quotation marks omitted.) *Suarez-Negrete* v. *Trotta*, 47 Conn. App. 517, 521, 705 A.2d 215 (1998).

The court does not find the requisite intent to steal. The payment of a salary to Scobie and the use of project funds to pay for front-line expenses stemmed from erroneous and perhaps negligent reading of the loan documents and applicable authorities. The use of project revenue to pay legal fees for lawsuits involving the lender was primarily the result of excessive zeal by the defendants rather than a desire to steal the lender's money.

The closest case is the provision of a rent-free apartment to Carbone. The court has found that the defendants took this action in bad faith. However, the court, having heard the evidence, finds that the primary motivation was to confer an under-the-table benefit on Carbone. In doing so, the defendants recklessly disregarded their net cash obligations to the lender, but they did not act with the specific intent of stealing money.

The plaintiff relies on various statements made by CDC employees to the effect that they should "use up the cash." (Pl. Br., pp. 1, 43–44.) According to the plaintiff, these statements reveal the defendants' intent to shelter net cash from the plaintiff's reach. The court does not interpret these statements in the same sinister way. Rather, these comments merely show that a delay in the processing of invoices made it difficult for CDC

employees to reconcile their monthly statements for Underwood.

In general, the court credits the testimony of Hubbard, Scobie, and CDC Chief Financial Officer Witt that they never consciously sought to reduce net cash and never discussed doing so with anyone else or directed anyone else to do so. (Hubbard, cross-examination; Scobie, direct; Witt, cross-examination.) Although the owners received the benefit of tax losses that allowed them to defer taxation of their other income, the owners never made any profit on their investment. (Hubbard, direct and cross-examination; Scobie, cross-examination; Witt, cross-examination; Scobie, 3/19/09, pp. 74–75.) For all these reasons, the court denies liability on count five.

E

Count Seven: Unjust Enrichment

In count seven, the plaintiff alleges unjust enrichment against CDC based on its collection of front-line expenses in excess of the management fee and on Underwood's provision of a salary to Scobie that supplemented his CDC salary. "Unjust enrichment is, consistent with the principles of equity, a broad and flexible remedy. . . . Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." (Internal quotation marks omitted.) *Vertex, Inc.* v. *Waterbury*, 278 Conn. 557, 573, 898 A.2d 178 (2006).

CDC's liability under this theory for the front-line expenses is clear, as CDC received payments from project funds that otherwise should have gone to the plaintiff. The salary paid to Scobie by Underwood is not as clear because it is not immediately obvious how CDC benefited. The plaintiff argues, however, that this action freed up other funds to pay substantial salaries to CDC's principals. (Pl. Br., p. 48.) That theory gains support from the fact that Hubbard received an annual CDC salary of over $500,000 in 2008. Further, Scobie did testify that CDC ultimately bore responsibility if Scobie's $400,000 CDC compensation was excessive and that CDC should instead have hired the proper staff at the proper salary. (Scobie, redirect.) Accordingly, the court finds that the plaintiff has proven its full unjust enrichment claim by a preponderance of the evidence.

The plaintiff claims $408,588 in damages, which appears to represent the total amount of front-line expenses paid to CDC and salary paid to Scobie by Underwood for the years 2006 to 2008. (Ex. 1160.) The court imposes damages in that amount on CDC on count seven.

F

Count Nine: Fraud

In the ninth count, the plaintiff alleges fraud against both Underwood and CDC based on alleged misrepresentations made by these defendants in their financial statements and reports about Scobie's salary, Carbone's apartment, and the various other categories of purported misuse of project revenues. The court finds no liability on this count.

The essential elements of a cause of action in fraudulent misrepresentation are: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon the false representation to his injury. *Centimark Corp.* v. *Village Manor Associates Ltd. Partnership*, 113 Conn. App. 509, 522, 967 A.2d 550, cert. denied, 292 Conn. 907, 973 A.2d 103 (2009). The plaintiff must prove its case by the higher standard of clear and convincing evidence. See *Foley* v. *Huntington Co.*, 42 Conn. App. 712, 732 n.7, 682 A.2d 1026, cert. denied, 239 Conn. 931, 683 A.2d 397 (1996). Even assuming that the plaintiff has proven the first three elements by this higher burden, its case falters on the fourth element, which essentially requires detrimental reliance. The only specific basis mentioned in the plaintiff's brief for proof of the fourth element is the fact that it agreed to a "litigation hold" between April 28 and May 30, 2006. (Pl. Br., p. 49; Ex. 83.) However, it is unclear precisely what damages, if any, the plaintiff suffered during this brief litigation hold. It is also unclear how the plaintiff would have incurred less damages without the litigation hold, especially given that it did not institute suit until December, 2006, and, as the court has established, the defendants continued to violate the net cash rules even after the filing of the lawsuit. Given that the plaintiff has thus failed to prove detrimental reliance, the court denies liability on this count.

G

Count Ten: Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.

In the tenth and final count, the plaintiff sues Underwood and CDC under CUTPA. To determine whether a party's conduct violates CUTPA, the court must consider the following criteria: "(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some [common-law], statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]." (Internal quotation marks omitted.) *Votto* v. *American Car Rental, Inc.*, 273 Conn. 478, 484, 871 A.2d 981 (2005). Although all three criteria do not

need to be satisfied to support a finding of unfairness; id.; a key element of CUTPA is that the conduct involve some level of aggravated behavior. See *Soto* v. *Bushmaster Firearms International, LLC*, 331 Conn. 53, 123, 202 A.3d 262 (2019) ("CUTPA, for example, has long been construed to incorporate the [United States Federal Trade Commission's] traditional cigarette rule, which prohibits as unfair advertising that is, among other things, immoral, unethical, oppressive and unscrupulous."(internal quotation marks omitted)). In this case, for the reasons stated previously, the court finds that the defendants' conduct, while occasionally in bad faith or reckless, did not rise to the level of being immoral, unethical, oppressive or unscrupulous. Accordingly, the court denies liability on the CUTPA count.

## VI

## CONCLUSION

Based on the analysis presented previously, the court denies the motion to dismiss and enters a judgment of strict foreclosure in favor of the plaintiff. In addition, the court finds Underwood liable to the plaintiff in the amount of $1,766,057 (in addition to the proceeds of the foreclosure), which represents the total damages for breach of contract and breach of the covenant of good faith. The damages for conversion overlap with the damages under these other theories, and, therefore, the court does not add them to the total. The court finds CDC liable to the plaintiff in the amount of $408,588 under the unjust enrichment count.

It is so ordered.

* Affirmed. *LPP Mortgage, Ltd.* v. *Underwood Towers Ltd. Partnership*, 205 Conn. App. 763, A.3d (2021).

[1] The other appearing defendants are Greystone Servicing Corporation, Inc., the city of Hartford, and United Way of the Capital Area, Inc. These defendants may become involved in posttrial proceedings.

[2] Whenever possible, the court will provide a citation that includes the name of the person who testified on the point in question and either the date of his or her prerecorded testimony and the page in the transcript, or the portion of his or her live testimony (direct, cross-examination, redirect, recross) in which the testimony in question occurred.

The exhibits containing the transcripts of the out-of-court testimony of the witnesses are as follows:

| | |
|---|---|
| Arthur Adams | Ex. 349A |
| Nicholas Carbone | Ex. 350 |
| Ann Ryan | Ex. 486A |
| Gregory Odean | Ex. 1150A |
| John Scobie | Exs. 357A, 1158 |

[3] "Partial payment of claim," or "PPC," is a phrase used in these cases to refer to a situation in which HUD, as guarantor, makes payment on a mortgage in default.

[4] John Scobie, the general manager of Underwood, testified that the first default occurred because of a loss in occupancy resulting from construction problems with the parking garage. (Scobie, 3/18/09, p. 72.)

[5] The court discusses this transfer in greater detail in part III B 2 of this opinion.

[6] Payments by the defendants have not fully covered the interest accruing on Note B, so those payments have not reduced the principal on Note B or the interest on Note A. (Odean, 2/11/09, pp. 54, 59–60; Ex. 1159, p. 5, ¶ 155.) Payments of net cash to Beal Bank and the plaintiff typically have amounted to $200,000 per year. (Scobie, 3/18/09, pp. 85, 127.) Note B is also senior in

priority to Underwood's obligation to make payments in lieu of taxes (PILOTs) to the city of Hartford. But the PILOTs, which total approximately $426,310 per year and are in arrearage of approximately $3.5 million, have seniority over Note A, which creates another reason why the plaintiff, as a practical matter, cannot enforce Note A at this point. (Scobie, 2/6/19 p.m., pp. 48–49; Witt, 1/16/19 p.m., p. 33; Exs. 16, 601.)

[7] Almost all of the project's gross revenue comes from rents paid by tenants.

[8] The "First Note" refers to the 1985 first mortgage note in the original principal amount of $35 million ultimately assigned to Greystone. (Ex. 10, p. 1.)

[9] "Additional Note B Payments" refer to the monthly net cash payments. (Ex. 10, p. 3.)

[10] "Minimum Note B payments" refer to a service charge consisting of monthly payments equaling 0.5% of the unpaid principal balance on the debt. (Ex. 10, p. 3.)

[11] In pertinent part, General Statutes § 42a-3-309 provides: "(a) A person not in possession of an instrument is entitled to enforce the instrument if (i) the person was in possession of the instrument and entitled to enforce it when loss of possession occurred, (ii) the loss of possession was not the result of a transfer by the person or a lawful seizure, and (iii) the person cannot reasonably obtain possession of the instrument because the instrument was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process. . . ."

[12] General Statutes § 42-3-301 provides: " 'Person entitled to enforce' an instrument means (i) the holder of the instrument, (ii) a nonholder in possession of the instrument who has the rights of a holder, or (iii) a person not in possession of the instrument who is entitled to enforce the instrument pursuant to section 42a-3-309 or 42a-3-418 (d). A person may be a person entitled to enforce the instrument even though the person is not the owner of the instrument or is in wrongful possession of the instrument."

[13] *Deutsche Bank National Trust Co.* v. *Bliss*, supra, 159 Conn. App. 489, cited to *U.S. Bank, N.A.* v. *Ugrin*, 150 Conn. App. 393, 401, 91 A.3d 924 (2014). The latter case noted at least one exception to what *Deutsche Bank National Trust Co.* held: the case of a loan servicer entitled to enforce a note pursuant to rights acquired under a pooling and servicing agreement. See *U.S. Bank, N.A.* v. *Ugrin*, supra, 401, citing *J.E. Robert Co.* v. *Signature Properties, LLC*, 309 Conn. 307, 318, 71 A.3d 492 (2013). There is also Appellate Court case law contrary to *Deutsche Bank National Trust Co.* See *Bankers Trust of California, N.A.* v. *Neal*, 64 Conn. App. 154, 157, 779 A.2d 813 (2001), citing *Bedford Realty* in foreclosure case for proposition that "[t]he law is clear that it is unnecessary for a plaintiff to possess a note at the time it was lost."

[14] In full, General Statutes § 42a-3-310 (b) (4) provides: "Unless otherwise agreed and except as provided in subsection (a), if a note or an uncertified check is taken for an obligation, the obligation is suspended to the same extent the obligation would be discharged if an amount of money equal to the amount of the instrument were taken, and the following rules apply . . .

"If the person entitled to enforce the instrument taken for an obligation is a person other than the obligee, the obligee may not enforce the obligation to the extent the obligation is suspended. If the obligee is the person entitled to enforce the instrument but no longer has possession of it because it was lost, stolen, or destroyed, the obligation may not be enforced to the extent of the amount payable on the instrument, and to that extent the obligee's rights against the obligor are limited to enforcement of the instrument."

[15] In its summary judgment ruling, the court determined that § 42a-3-309 does not operate as an erasure statute that prevents reliance on the terms of Note B. (Entry #662.00, pp. 22–24.) The court reaffirms that aspect of the ruling. As stated there, the mortgage incorporates the note by reference. Further, the terms of the note are not in dispute, as the defendants have admitted that exhibit 10 is a fair and accurate copy of the original note. See *New England Savings Bank* v. *Bedford Realty Corp.*, supra, 238 Conn. 760 ("A bill or note is not a debt; it is only primary evidence of a debt; and where this is lost, impaired or destroyed bona fide, it may be supplied by secondary evidence. . . . The loss of a bill or note alters not the rights of the owner, but merely renders secondary evidence necessary and proper. . . . GHR or its assignee is free to present reliable evidence other than the original promissory note to establish the amount of the debt." (Citations omitted; internal quotation marks omitted.)).

[16] The following is questioning by the defendants' counsel of William N. Hubbard, the managing partner of Underwood's general partner and president of CDC:

"Q. When did you first become aware of the fact that Note B, in regard to Underwood, was lost?

"A. Several years ago, but I couldn't tell you the exact date." (1/10/19 p.m., p. 42.)

[17] The defendants separately brief their concerns about the transaction between HUD and Beal. The assignments, endorsements, and affidavits discussed previously concerning this transaction, along with Underwood's admissions in its financial statements and its monthly payments to Beal, collectively establish the validity of the transfer of the mortgage and the debt from HUD to Beal.

[18] The regulatory agreement similarly provides: "Owners shall not without the prior written approval of the Secretary . . . [a]ssign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds except from surplus cash, except for reasonable operating expenses and necessary repairs." (Ex. 1, p. 2, ¶ 6 (b).)

[19] The defendants' brief addresses a seventh category involving alleged failures to comply with reporting requirements. However, the plaintiff no longer claims this category as a basis for default. The court therefore will not consider it further in that context.

[20] Although the plaintiff briefs the arguments that acceleration was proper based on monthly—rather than annual—defaults in installment payments and that the loan documents do not require a notice of default, the defendants do not contest these arguments in either their opening or their reply brief. (Pl. Br., pp. 12–14.)

[21] As suggested, the plaintiff does not challenge the characterization of Skinner's basic compensation as a consultant, which approximated $46,000 from 2002 to 2007, as a reasonable operating expense. (Odean, 2/17/2009, p. 83.)

[22] Nonetheless, Underwood should have complied with HUD contracting guidelines that require the solicitation of written contract bids. (Grubman, direct; Ex. 407, p. 75, ¶ 6.50.) Further, if the defendants sought to treat Skinner as a contractor, they should have drawn up a written contract with a bonus provision so that the auditors could properly review her compensation package.

[23] Scobie testified that a written management agreement existed but that that he can no longer find it (Scobie, 3/19/09, p. 18.)

[24] Unless otherwise noted, citations to Stewart A. Grubman's testimony refer to his testimony in the plaintiff's case-in-chief rather than his rebuttal testimony.

[25] Stewart A. Grubman and Witt testified without contradiction that the project never had "excess Net Cash." (Grubman, cross-examination; Witt, redirect.)

[26] The plaintiff's brief cites exhibit 1160 to support its claim for $577,593 in management fees, but the exhibit clearly indicates that the total is $517,400. (Pl. Br., p. 33.)

[27] Scobie's CDC salary also compensated him for work on other projects managed by CDC. (Scobie, 4/22/09, p. 50.) Hubbard also drew a salary from CDC of more than $500,000. (Hubbard, redirect; Ex. 327, p. 23.)

[28] The financial statements instead included Scobie's salary under the separate category of "Office Salaries." (Witt, direct; Grubman, direct; Hubbard, redirect.)

[29] Grubman testified credibly that other exceptions in the Handbook also do not apply. (Ex. 407, p. 69, § 6.39 (c).)

[30] Similarly, the 1985 regulatory agreement between Underwood and HUD, which both the 1990 second mortgage and the 1996 modification incorporate by reference, provides as follows: "Owners shall not without the prior written approval of the Secretary . . . [m]ake, or receive or retain, any distribution of assets or any income of any kind of the project except surplus cash . . . ." (Ex. 1, p. 2, ¶ 6 (e); Ex. 6, p. 2, ¶ 3; Ex. 17, p. 1, ¶ D.) The provision includes some additional exceptions that do not apply here. The regulatory agreement defines "distribution" as "any withdrawal or taking of cash or any assets of the project . . . and excluding payment for reasonable expenses incident to the operation and maintenance of the project." (Ex. 1, p. 5, 11a.) The HUD Handbook states that a "distribution" for purposes of the regulatory agreement includes "supervisory fees paid to general partners and any salaries or other fees paid to the sponsor or mortgagor, unless those salaries or fees have been approved by HUD as essential to the project

. . . ." (Ex. 406, p. 17, § 4370.2.) The HUD Handbook also provides: "There will be no distributions to any type owner until the second mortgage is brought current." (Ex. 405, p. 70, § 10-20 (B).) In view of the court's decision that the salary provided to Scobie violated the second mortgage itself, it is unnecessary to consider these additional prohibitions on distributions.

[31] Grubman testified that project rents are not part of "surplus cash." (Grubman, direct.)

[32] As noted, the second mortgage provides that the defendants can only use project rents "in accordance with the provisions of the Regulatory Agreement." (Ex. 6, p. 2, ¶ 4.)

[33] The defendants argued at trial that the plaintiff has failed to consider the replacement cost if Scobie did not do work for Underwood. However, because the court is ruling that Scobie's salary from Underwood is not a reasonable and necessary use of project assets and that his CDC salary of up to $440,000 adequately compensated him for his work for both entities, there was no need for a replacement and no replacement cost. (Grubman, redirect; Grubman, rebuttal redirect.)

[34] Carbone was approximately seventy-two at the end of the trial period in this case. He died before the retrial of this case.

[35] Both the defendants' auditor and their expert accountant testified that the defendants should have disclosed this information, either as a "related party transaction" because Carbone was a limited partner of Underwood or at least as a long-term obligation of the project. (Adams, 6/26/08, pp. 121, 137–38; Barsky, cross-examination.)

[36] As noted, the 1985 regulatory agreement between Underwood and HUD, which both the 1990 second mortgage and the 1996 modification incorporate by reference, contains a similar prohibition. See footnote 30 of this opinion. In view of the court's decision that the apartment provided to Carbone violated the second mortgage itself, it is unnecessary to consider this additional prohibition on distributions.

[37] The plaintiff's damages calculation appears based correctly on the assumption that Carbone's rent should have been $725 per month from 2000 to 2004 and $1150 per month from 2005 through 2008. Assuming, however, that Carbone paid $150 per month from February to December, 2008, or a total of $1650, the total rent loss would be $97,050.

[38] The defendants suggest that the additional revenue from the rental of Carbone's apartment might have gone only to reduce outstanding payables rather than add to net cash. As Grubman testified, however, paying more bills in one month would have meant having to pay fewer the next month, which would eventually have increased net cash. (Grubman, initial questioning by the court.)

[39] For the purposes of the present case, capital assets are the same as fixed assets. The evidence established that, when Underwood decided to "capitalize" an item, it included it in a schedule of additions to fixed assets. (Adams, 6/26/08, pp. 79–80; Scobie, 3/19/09, p. 4; Grubman, direct.)

[40] Both expert accountants testified in this case that "capitalizing" as opposed to "expensing" an expenditure means that an accountant would depreciate the expenditure over time rather than deduct all of it in the year of expenditure. The experts also agreed that, assuming the revenue in both cases came from project funds, the decision whether to capitalize or expense the expenditure would have no impact on net cash.

[41] The plaintiff's reply brief states that, "in the second PPC, [Underwood] sought permission to use Project rents to pay for capital improvements, and HUD denied that request." (Pl. Reply Br., p. 14.) This statement is misleading. The defendants never made an explicit request in the second PPC to use operating revenues, as a general matter, for capital improvements. Without saying so expressly, the plaintiff's reply brief apparently refers to a footnote in its opening brief in which it states that the defendants proposed to use $255,000 in net cash generated between April 14 and August 1, 1995, to pay for an energy savings plan. (Pl. Br., pp. 31–32 n.17; Ex. 36, p. 6.) Instead of denying this request outright, HUD responded by stating that the defendants could use $125,000 in net cash funds that were currently being held in their operating account and would have to provide the remaining financing on their own. (Ex. 38, p. 1, ¶ 5.) Thus, to some extent, HUD actually granted permission to use operating revenues for a capital project. In any event, HUD's reasoning is unclear, and its decision does not necessarily dictate that HUD disapproved the defendants' use of operating revenues to fund other capital projects. (Scobie, 3/19/09, pp. 6–16; Grubman, direct.)

[42] Scobie testified that it was his decision as to whether to make an application to HUD for permission to use funds in the reserve replacement

account or to use operating revenues and that HUD never denied his requests to use the reserve account. (Scobie, 3/18/19, pp. 140, 142; 4/9/09, p. 12.)

[43] The defendants' expert accountant, Barsky, testified that the defendants could use operating revenues to fund capital projects as long as the latter did not change the footprint of the building. (Barsky, direct.) There is no evidence or claim in this case that the capital improvements in question changed the project's footprint.

[44] The court has taken judicial notice of the complaint in that matter.

[45] Although a provision of the HUD handbook authorizes HUD to provide written waivers of handbook directives in certain situations, there is no evidence that HUD actually provided a waiver, written or otherwise, for attorney's fees in this case. (Ex. 407, § 1.10.a (3).)

[46] The defendants failed to report this injunction to their auditor, Weiser, LLP. An accountant with Weiser testified that, had the defendants reported this information, the auditor would have had to make a "Finding" and possibly taken corrective action such as notifying HUD. (Adams, 6/26/08, pp. 154–61.)

[47] The defendants cite language in the regulatory agreement that provides: "Upon a violation of any of the above provisions of this Agreement by Owners, the Secretary may give written notice, thereof, to Owners . . . [i]f such violation is not corrected to the satisfaction of the Secretary within thirty (30) days . . . without further notice the Secretary may declare a default under this Agreement . . . ." (Ex. 1, p. 4, ¶ 11; Def. Br., p. 44.) Even assuming that this provision applies, the plaintiff, as stated, did provide the defendants notice of violations as early as January, 2006.

[48] The total net cash diverted stems from the addition of the following components:

| | |
|---|---|
| $517,400 | Management fees |
| $805,663 | John Scobie compensation |
| $97,050 | Nicholas Carbone apartment |
| + $254,302 | Legal fees |
| $1,674,415 | |

[49] Presumably, however, if the foreclosure action recovered the full unpaid principal and accrued interest, the plaintiff would not seek additional damages, as the damages represent diversions of principal and interest payments that the defendant should have made. (Odean, 2/17/09, p. 33.)

[50] Although HUD was the original "Grantee" under the 1990 mortgage, Underwood gave the mortgage to the "Grantee, its successors and assigns." (Ex. 6, p. 1.) The third category—"assigns"—clearly encompasses the plaintiff. The 1996 modification made this point clearer by defining "Grantee" to refer to the "Secretary of Housing and Urban Development, his successors and assigns . . . ." (Ex. 17, p. 1.) Thus, the mortgage, as assigned, gives ownership of the rents to the plaintiff here.

[51] General Statutes § 49-1 provides: "The foreclosure of a mortgage is a bar to any further action upon the mortgage debt, note or obligation against the person or persons who are liable for the payment thereof who are made parties to the foreclosure and also against any person or persons upon whom service of process to constitute an action in personam could have been made within this state at the commencement of the foreclosure; but the foreclosure is not a bar to any further action upon the mortgage debt, note or obligation as to any person liable for the payment thereof upon whom service of process to constitute an action in personam could not have been made within this state at the commencement of the foreclosure. The judgment in each such case shall state the names of all persons upon whom service of process has been made as herein provided." The court in *Shillea* added that § 49-1 "[does] not bar this independent action for damages for breach of the covenant against encumbrances in the deed." *First Connecticut Small Business Investment Co.* v. *Shillea*, supra, 3 Conn. L. Rptr. 296. While § 49-1 does bar deficiency judgments, except for those pursued under procedures set out in General Statutes § 49-14; see *First Bank* v. *Simpson*, 199 Conn. 368, 370–71, 507 A.2d 997 (1986); the plaintiff here, as explained throughout this decision, is not seeking a deficiency judgment.

[52] The only two special defenses mentioned in the defendants' brief that purport to apply to all seven remaining counts are statute of limitations and waiver. (Def. Br., pp. 47–48.) However, because the defendants supply no analysis of these defenses, the court considers them abandoned. See *Raynor* v. *Commissioner of Correction*, supra, 117 Conn. App. 796–97.

[53] Again, paragraph four of the second mortgage provides: "That all rents, profits and income from the property covered by this Mortgage are hereby assigned to the Grantee for the purpose of discharging the debt hereby

secured. Permission is hereby given to Grantor so long as no default exists hereunder, to collect such rents, profits and income for use in accordance with the provisions of the Regulatory Agreement."

[54] Although the court also disagrees with the plaintiff's claims stemming from Skinner's work as a consultant, the plaintiff's proposed conversion damages apparently do not include that claim. (Ex. 392.) Therefore, the court does not have to deduct that amount from the total.